*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
―――――――――――

ERIC KUHN,

          *Plaintiff-Appellant,*

       *v.*

WASHTENAW COUNTY and JAMES
ANUSZKIEWICZ,

          *Defendants-Appellees.*

No. 12-1609

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-11191—Denise Page Hood, District Judge.

Argued: January 23, 2013

Decided and Filed:  March 11, 2013

Before:  CLAY, GILMAN, and McKEAGUE, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** John H. DeYampert, Jr., DEYAMPERT LAW COMPANY PLLC, Westland, Michigan, for Appellant.  Keith E. Eastland, MILLER JOHNSON, Grand Rapids, Michigan, for Appellees.  **ON BRIEF:** John H. DeYampert, Jr., DEYAMPERT LAW COMPANY PLLC, Westland, Michigan, for Appellant.  Keith E. Eastland, Thomas R. Wurst, MILLER JOHNSON, Grand Rapids, Michigan, for Appellees.

―――――――――――

## OPINION

―――――――――――

RONALD LEE GILMAN, Circuit Judge.  In October 2008, Deputy Eric Kuhn of the Washtenaw County Sheriff's Office stopped Marianne Joseph for a traffic violation.  Joseph falsely reported that Kuhn had raped her in connection with the stop. An internal investigation that was opened to look into the rape allegation was not closed until January 2009.  Several months after the investigation was closed, Kuhn requested

1

medical leave based on stress.  Kuhn eventually took approximately seven months of paid and unpaid leave that did not end until he was terminated in January 2010.  He subsequently filed suit for wrongful termination against both his employer, Washtenaw County, and his superior, Lt. James Anuszkiewicz.

Against the County only, Kuhn asserted claims for termination without due process of law, violation of Michigan's Whistleblowers' Protection Act, Mich. Comp. Laws § 15.361 *et seq.*, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Kuhn asserted a claim against Lt. Anuszkiewicz only for tortious interference with a business expectancy.  Against both the County and Lt. Anuszkiewicz, Kuhn asserted claims for racial discrimination in violation of 42 U.S.C. § 1981, for racial discrimination and harassment in violation of Title VII, and for racial discrimination and harassment in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*

The district court granted summary judgment in favor of both defendants on all claims, and Kuhn appeals.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

Kuhn stopped Joseph at approximately 3:00 a.m. on October 20, 2008 for erratic driving.  Joseph attempted to flee, but backup officers apprehended her and placed Joseph in the back of Kuhn's squad car.  While en route to the Washtenaw County Jail, Joseph threatened to report that Kuhn had raped her, saying that she would be believed because Joseph is white and Kuhn is black.

Joseph indeed reported to several officers at the Jail, including Sgt. Marlene Radzik, that Kuhn had raped her.  Pursuant to Washtenaw County Sheriff's Office procedure, this type of complaint required an internal investigation:

> The Washtenaw County Sheriff's Office will accept and investigate all complaints about the conduct of its employees from any citizen or agency employee.  Following a thorough and impartial

examination of the available factual information, it will be determined if improper employee conduct did in fact occur. . . .

. . . .

. . . Any allegation of improper or inappropriate conduct by an employee . . . , regardless of its apparent validity, is a complaint or inquiry and will be recorded on the appropriate form(s). . . .

Sgt. Radzik contemporaneously concluded that the rape allegation was false, and she reported her conclusion to Lt. Anuszkiewicz. Lt. Anuszkiewicz initially directed Sgt. Radzik to contact the Michigan State Police, but because these events were transpiring in the middle of the night, Radzik could not reach any person at the local State Police post and decided against calling a random state trooper on the road. Later, Lt. Anuszkiewicz determined that there was no need to contact the State Police and instead directed Sgt. Radzik to take action against Joseph for filing a false police report. He also instructed Radzik to initiate a citizen's complaint against Kuhn as required by the Sheriff's Office Policy and Procedure.

A few days later, an internal complaint number was issued. Joseph in the meantime went to a local hospital reporting that she had been raped, and a rape kit was completed. Lt. Anuszkiewicz directed Judi Swidan, the Sheriff's Office property officer, to send the rape kit to the Michigan State Police crime lab for the criminal investigation of Joseph, but he contends that he did not instruct Swiden on how to fill out the associated paperwork. Kuhn, on the other hand, alleges that Lt. Anuszkiewicz instructed Swidan to list Kuhn as the suspected perpetrator of the alleged rape.

The results of the rape kit showed no seminal fluid. Lt. Anuszkiewicz then directed Sgt. Radzik to add the results of the rape kit to the internal investigation and to request that the state prosecutor charge Joseph with filing a false police report.

In December 2008, Kuhn informed Lt. Anuszkiewicz and Commander of Police Services Marilyn Hall-Beard that he was concerned about the rape allegation. Commander Hall-Beard mistakenly assured Kuhn that he was not under any internal investigation, but she later discovered that a citizen's complaint against Kuhn had in fact

been initiated. She emailed Lt. Anuszkiewicz to ask why a citizen's complaint had been opened, and Lt. Anuszkiewicz explained that he had done so based on his understanding of departmental policy. Commander Hall-Beard replied that she did not believe that the policy required opening a citizen's complaint under the circumstances, but she acknowledged that Lt. Anuszkiewicz had done what he thought was proper. She also directed Lt. Anuszkiewicz and Sgt. Radzik to stop the investigation. They did not, however, immediately do so.

Dieter Heren assumed the position of Commander of Police Services on January 1, 2009, replacing Commander Hall-Beard. He promptly directed Lt. Anuszkiewicz and Sgt. Radzik to complete and close the internal investigation without further delay, which Sgt. Radzik did later in January. Due to an oversight, Commander Heren did not inform Kuhn that the internal investigation was closed until March 2009.

Later that March, Kuhn filed a complaint against Lt. Anuszkiewicz, alleging that the lieutenant had engaged in unprofessional behavior with respect to the internal investigation. The investigation of Kuhn's complaint was not completed until November 2009. In relevant part, the investigation determined that (1) although Lt. Anuszkiewicz had the proper authority to involve the State Police in the investigation against Kuhn, he did nothing wrong in ultimately deciding not to contact that organization; (2) Lt. Anuszkiewicz did not violate any departmental policy in failing to notify either Commander Hall-Beard or the police union of the citizen's complaint and internal investigation; and (3) Lt. Anuszkiewicz did not act with malice even if he did direct that Kuhn be listed as a suspect on the paperwork for the rape kit. But the investigation concluded that Lt. Anuszkiewicz had acted improperly in disobeying Commander Hall-Beard's directive to promptly close the internal investigation.

Kuhn began treatment in February 2009 for the stress that he was experiencing as a result of the investigation. In May 2009, two months after he was informed that the investigation against him had been closed, he requested leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, which he took until his FMLA leave expired in late August 2009. Kuhn then requested discretionary leave, which was

granted on an unpaid basis until the investigation of his complaint against Lt. Anuszkiewicz was completed in November 2009.

In July 2009, Kuhn sent an email to his union president that expressed frustration with the lack of information from the Sheriff's Office about his complaint against Lt. Anuszkiewicz. He also stated that he was "aware of several incidents involving other deputies who were ignored, mistreated, unfairly targeted and denied advancement because they spoke up about misconduct." But Kuhn did not refer to any specific incident.

In August 2009, Kuhn sent substantially the same email to County Administrator Bob Guenzel and copied several other individuals, including Sheriff Jerry Clayton, Undersheriff Mark Ptaszek, Commander Heren, Kuhn's union representative, and the union president. In this email, Kuhn requested a meeting with Guenzel to discuss his pending complaint against Lt. Anuszkiewicz. Guenzel forwarded this email to the County's Risk Manager, Judy Kramer, and to the Director of Labor Relations, Diane Heidt. Kramer then arranged a meeting between herself, Heidt, Kuhn, and Undersheriff Ptaszek in September 2009. During this meeting, which was secretly recorded by Kuhn and later transcribed, Undersheriff Ptaszek explained that the Sheriff's Office wanted Kuhn to return to work. Heidt added that a medical release was required before Kuhn could resume his duties. Kuhn was also informed that they took his allegations of deputy mistreatment seriously and wanted to investigate Kuhn's claims, but Kuhn refused to give specific information about the allegations.

At Kuhn's request, Kramer sent Kuhn an email in October 2009 regarding his rights under Michigan's Whistleblowers' Protection Act and a copy of the Act. She also requested that Kuhn meet with her again to continue their discussion about deputy mistreatment. Kuhn replied: "I will follow up with you when I receive a disposition for my complaint against Lt. Anuszkiewicz."

In November 2009, Undersheriff Ptaszek emailed Kuhn to inform him that the investigation of Lt. Anuszkiewicz was complete and to arrange for Kuhn's return to work. Kuhn responded with a doctor's note stating that he could not return to work until

January 3, 2010.  Undersheriff Ptaszek then extended Kuhn's discretionary leave to that date, but he cautioned that "doing so is extraordinary.  I do not envision extending it any further."  He reiterated that the Sheriff's Office wanted to investigate Kuhn's allegations of deputy mistreatment and wanted Kuhn to return to work.

Kuhn nevertheless requested another extension of his discretionary leave on December 11, 2009.  On December 30, 2009, Undersheriff Ptaszek emailed Kuhn to advise him that, due to "economic and operational conditions" faced by the County and the Sheriff's Office, the Sheriff's Office could "no longer continue a discretionary unpaid leave of absence."  Ptaszek cited a "void in public service" caused by Kuhn's absence and the fact that "as a result of contract revisions with Ypsilanti Township, the Sheriff's Office must eliminate seven (7) deputy positions."  For these reasons, Ptaszek stated that the Sheriff's Office was "unable to grant the further discretionary unpaid leave of absence" that Kuhn had requested.  The message concluded by informing Kuhn that his "employment with the Washtenaw County Sheriff's Office will terminate effective Monday January 4th, 2010."

Kuhn forwarded this message to his union representative, who "strongly encourage[d]" that "if . . . at all possible . . . [Kuhn] return to work on January 3rd, 2010."  Kuhn did not do so.  Instead, his attorney sent a letter to the Sheriff's Office on January 4, 2010, stating that "Kuhn will not be reporting to duty."

## II.  ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment.  *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011).  Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.      Kuhn was afforded all the process that he was due**

Kuhn alleges a procedural due process claim under the Due Process Clause of the U.S. Constitution and 42 U.S.C. § 1983. He argues that the County unlawfully denied him a hearing before terminating his employment as a deputy. The County, in response, contends that the availability of post-deprivation remedies allows the pretermination process to be less formal and that Kuhn was given all the pretermination process that he was due.

To prevail on this claim, Kuhn must first establish that he had a protectable property interest in his position as a law enforcement officer. *See Miller v. Admin. Office of the Courts*, 448 F.3d 887, 895 (6th Cir. 2006) (noting that the first step in analyzing a procedural due process claim "is to determine whether [a plaintiff] had an interest that was protected by the Due Process Clause"). There is no dispute that Kuhn had a protectable property interest in his job.

The second step of the analysis is to determine whether Kuhn was "afforded the procedures to which government employees with a property interest in their jobs are ordinarily entitled." *See id.* (internal quotation marks omitted). The Supreme Court has explained that the deprivation of a property interest must be preceded by notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Sufficient pretermination process "need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997). Such a procedure serves as an "initial check against mistaken decisions." *Loudermill*, 470 U.S. at 545.

### 1.    *Kuhn had sufficient notice of his impending termination*

Kuhn first argues that he did not have notice of his termination.  He contends that the December 30, 2009 email terminated his employment immediately rather than notified him of his impending termination.   But the district court found that the December 30th email did not immediately terminate Kuhn's employment; instead, the email stated that the termination was effective January 4, 2010.  *Kuhn v. Washtenaw Cnty.*, No 10-11191, 2012 WL 1229890, at *5 (E.D. Mich. Apr. 12, 2012).

We find no error in that determination.  Undersheriff Ptaszek's email explained that Kuhn had requested and been granted two periods of discretionary leave, extending through January 3, 2010.  The email further noted that Kuhn had requested a third period of discretionary leave, which he had previously been informed was not likely to be granted.   Finally, the email stated that the County was declining to grant further discretionary leave and, therefore, that Kuhn's employment would terminate effective January 4, 2010.  Rather than immediately terminating Kuhn's employment, this email simply informed him that his employment would terminate at the end of his previously approved discretionary leave.  Kuhn appeared to be aware that he could have chosen to return to work, as evidenced by his union representative's email advising him to return to work if possible by January 3 and by his attorney's letter informing the Sheriff's Office that Kuhn would not be reporting for duty on January 4.

The termination notice set forth in the December 2009 email should therefore have been no surprise to Kuhn.  And this court has previously held that a plaintiff is deemed to have received sufficient notice when he has "at least the sense of the charges against him."  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 409 (6th Cir. 1992).  Together, the November and December emails gave Kuhn adequate notice that his employment would be terminated on January 4, 2010 if he did not return to work prior to that date.

Kuhn further argues that the reasons for his termination as cited in the December 30, 2009 email were pretextual.  He bases this contention on Undersheriff Ptaszek's deposition testimony that the reference to the Ypsilanti Township deputy positions in the

email "is just a general explanation of the condition of the organization at the time. The Ypsilanti Township deputies per se didn't have anything to do with [Kuhn's termination]." Kuhn construes this testimony as establishing that the elimination of the deputy positions could not be the reason that he was terminated because no other deputies were fired.

This argument is unavailing. Kuhn's employment was not terminated as a result of contract negotiations with Ypsilanti Township, nor does the email imply that this was the case. Indeed, as Ptaszek explicitly stated elsewhere in his deposition, Kuhn was not fired because of "a shortage of funds or budget cuts within the Sheriff's Office as a result of the elimination of the Ypsilanti Township deputy positions." Rather, Ptaszek testified that Kuhn's discharge was necessary because he had "used up all his vacation time, comp time and sick time. He used up his entire FMLA leave. . . . [He] had extended all his benefits, plus he had been given additional time by the Sheriff's Office and wasn't able to return to work, so I had to terminate him." Ptaszek further testified that "[a]t some point, you reach a point where the organization can no longer not have a person coming to work." He elaborated that the "economic and operational conditions" language in the December 30th email referred to the fact that "[e]very time an employee doesn't come into work, somebody does that job for them. So there is a cost in either redistribution of manpower [or] overtime."

In short, Kuhn's absence was causing problems for the Sheriff's Office's payroll and human resources. The email accurately reflects these reasons for termination: the Sheriff's Office could no longer allow Kuhn's "discretionary unpaid leave of absence" because his absence was creating a "void in public service" that required either overtime pay for or reassignment of deputies to cover Kuhn's shifts.

In any event, if Kuhn wished to argue that the reasons cited in the December 30, 2009 email were pretextual, the opportunity to do so was at a post-termination proceeding. *See Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988) ("The full, post-termination, adversary, trial-type hearing will serve to ferret out bias, pretext, deception and corruption in discharging the employee. The adversary processes

employed in an adjudicatory, post-termination hearing controlled by an impartial judge lend themselves to proving wrongful conduct by the employer."). We conclude that the pretermination notice of Kuhn's discharge was constitutionally adequate.

### 2.    *The County's explanation for the discharge*

Kuhn further argues that he was not given a sufficient explanation for why he was terminated. His argument rests on the contention that the reasons given for his termination were pretextual. But as discussed above in Part II.B.1., there is no evidence that Kuhn was discharged for any reason other than the fact that he had exhausted his leave, that his absence was causing a staffing shortage at the Sheriff's Office, that the County elected not to continue his discretionary leave, and that he did not return to work. "[P]olice departments, as a matter of public policy, need to ensure that officers show up for work or are accounted for so an adequate force is available to maintain public safety." *Hudson v. City of Chicago*, 374 F.3d 554, 562 (7th Cir. 2004). The email from Undersheriff Ptaszek adequately explained these reasons.

### 3.    *Kuhn had several days in which to respond*

Kuhn makes a passing reference to the fact that he received the notice of his termination "over the Christmas-New Years' holiday season." But he offers no evidence or argument as to why he was unable to respond over the holidays, nor has he presented any evidence or argument that he attempted to respond before the January 4th deadline but was unable to do so.

Between December 30th, 2009 and January 4th, 2010, Kuhn could easily have contacted the Sheriff's Office and explained why he sought further administrative leave or thought that the impending termination was erroneous. "The employee, being confronted with the charges against him or her and being offered the chance to give a version of the incident, is responsible for the choice to not offer any competing evidence." *Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir. 1990). That Kuhn in fact consulted with both his union representative and his attorney prior to

January 4th bolsters the conclusion that he could have timely responded to Undersheriff Ptaszek's pretermination notice if he had wanted to.

### 4.      *Additional pretermination arguments*

Kuhn raises two additional arguments with respect to the pretermination process. First, in his reply brief only, he argues that the December 30th email violated Article 18.1 of the Collective Bargaining Agreement (CBA) under which he was covered. Article 18.1 provides as follows:

> Prior to any discipline or discharge of a bargaining unit member the employee will be provided a written notice of charges which shall contain the specific sections of rules and regulations and/or appropriate law or ordinance which the member is alleged to have violated. The notice of charges will be served on the employee at least ten (10) business days prior to any disciplinary action being taken.

The entirety of his argument consists of the conclusory statement that the December 30th email "violated the spirit" of the CBA.

This court does not usually consider issues raised for the first time on appeal in a reply brief, whether or not they were previously raised in the district court. *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 301 (6th Cir. 2006). But even if we assume *arguendo* that the issue is not waived, the section of the CBA that Kuhn cites has no apparent application to instances of exhausted leave. Instead, Article 21.1 of the CBA appears to be the relevant section, providing that "[a]ny employee desiring a leave of absence from his employment shall secure written permission from the Sheriff or Undersheriff. The maximum leave of absence shall be for thirty (30) days and *may* be extended for like periods. Permission for extension must be secured from the Sheriff or Undersheriff." (Emphasis added.)

Article 21.1 indicates that administrative leave is discretionary and that extensions may be denied, which is what happened in this case. In contrast, Article 18.1 deals with discipline or discharge stemming from a violation of departmental rules or applicable laws. Given that the CBA argument is purely a breach-of-contract claim,

Kuhn has not shown that the provision he cites actually applies to him. Kuhn's counsel, moreover, informed us at oral argument that Kuhn was not bringing any claims based on the CBA.

Second, Kuhn argues that his "administrative leave was based upon the stress of investigation," which he contends raises a genuine dispute of material fact as to whether he received sufficient process. This argument is misplaced. The procedural-due-process inquiry asks whether Kuhn had constitutionally adequate notice of his termination and an opportunity to respond. The reason for Kuhn's leave and ultimate termination is not a consideration relevant to this issue.

### 5.    *Post-termination process was available to Kuhn*

"Where there is a system of post-termination procedures available to the employee . . . coupled with a pretermination 'right of reply' hearing," the due process inquiry is satisfied. *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004). This court has held that "it is the *opportunity* for a post-deprivation hearing before a neutral decisionmaker that is required for due process." *Id.* (emphasis in original).

The district court concluded that Kuhn had the opportunity for post-deprivation process because his union could have pursued arbitration, or he could have pursued his own grievance without intervention from the union. Kuhn does not challenge this ruling on appeal except for the conclusory statement that "the lower court's treatment of post-termination procedure does not address the core issue of pre-termination due process." Because the opportunity for a post-deprivation hearing like the one available here "allows for an even less formal pre-termination hearing," *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 409 (6th Cir. 1992), we find no fault with the district court's conclusion that the availability of post-termination procedures permitted the informal pretermination process that Kuhn received.

**C.     Kuhn cannot establish a prima facie case of race discrimination because an internal investigation is not an adverse employment action**

### *1.     Burden-shifting standard*

All of Kuhn's discrimination claims are subject to the same burden-shifting standard. *See Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (discussing the burden-shifting framework for Section 1981 claims); *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011-12 (6th Cir. 1987) (discussing the same burden-shifting framework for Title VII and Michigan civil-rights claims). Neither party disputes the applicability of this standard. *See Kuhn v. Washtenaw Cnty.*, No. 10-11191, 2012 WL 1229890, at *6 n.3 (E.D. Mich. Apr. 12, 2012).

In order to prevail on the basis of race discrimination, Kuhn was required to produce either direct or circumstantial evidence of disparate treatment. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence is proof that, if believed, compels "the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Kuhn offered no direct evidence of disparate treatment.

In the absence of direct evidence of discrimination, this court analyzes disparate-treatment claims under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff claiming race-based discrimination supported only by circumstantial evidence must demonstrate that he (1) is a member of a protected class, (2) was qualified for the job at issue, (3) was subjected to an adverse employment action, and (4) was treated differently than a similarly situated nonprotected person. *See id.* at 802.

Once a plaintiff establishes a prima facie case, "the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009) (internal quotation marks omitted). The burden then shifts back to the plaintiff to

demonstrate "that the proffered reason was not the true reason for the employment decision," *id.* (internal quotation marks omitted), but was instead a pretext designed to mask unlawful discrimination, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391-92 (6th Cir. 2008).

### 2.    *Kuhn's race-based termination claims are waived*

In his opening brief, Kuhn focuses solely on the internal investigation as constituting an adverse employment action. The County in its responsive brief countered Kuhn's arguments, and then went further to address the race-based *termination* argument that Kuhn could have made. Kuhn contends in his reply brief that he argued in the district court that his termination was based on race.

This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived. *Caudill v. Hollan*, 431 F.3d 900, 915 n.13 (6th Cir. 2005) (citing recent decisions that stand for these two related propositions). In Kuhn's opening brief, his sole contention regarding his termination is that he "lost pay and his job on account of the investigation." The remaining pages of his brief devoted to his race-discrimination claims address only the internal investigation. We therefore decline to address any discrimination claims with respect to Kuhn's termination. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (declaring an argument waived where the plaintiff had "wholly fail[ed] to address th[e] issue in her appellate brief"). By failing to raise any specific challenges to the district court's decision regarding his termination, Kuhn has waived those challenges. *See id.*

### 3.    *Failure to establish a prima facie case of race discrimination*

Kuhn's primary argument is that the internal investigation into the rape allegation constituted an adverse employment action. The district court, however, held that "[t]he act of investigating possible employee misconduct is not an adverse [employment] action." *Kuhn*, 2012 WL 1229890, at *7. "An adverse employment action in the context of a Title VII discrimination claim is a materially adverse change in the terms or

conditions of employment because of the employer's actions." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (internal quotation marks omitted). Materially adverse changes in the terms and conditions of employment include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 594 (internal quotation marks omitted).

Kuhn responds by citing *Peltier v. United States*, 388 F.3d 984 (6th Cir. 2004), for the proposition that an internal investigation may be an adverse employment action if it is done in "bad faith." Peltier was an employee of the U.S. Department of Justice's Bureau of Alcohol, Tobacco and Firearms. She was the focus of an internal investigation when the agency believed that she had "tipped off" a suspect that the suspect's residence would be searched. Peltier was placed on paid administrative leave pending the outcome of the investigation. The agency ultimately determined that Peltier was innocent of wrongdoing, closed the investigation, reinstated Peltier, and instructed her to return to work. But Peltier, due to stress and depression allegedly suffered as a result of the investigation, refused to return to work. The agency subsequently terminated her employment.

Reasoning that Peltier was placed on paid administrative leave, was exonerated, and was allowed to return to work, the district court concluded that Peltier did not suffer an adverse employment action. *Id.* at 988. This court agreed, citing its previous holding that "a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." *Id.* (citing cases) (emphasis in original). A subsequent unpublished decision of this court reiterated this principle in a slightly different manner, stating that "neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action." *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (holding that an employer's internal investigation of an employee and its failure to notify

the employee of the investigation until after it had been completed did not constitute an adverse employment action).

Kuhn argues that *Peltier* stands for the proposition that an internal investigation is not an adverse employment action only if there is (1) suspension or paid leave with benefits, (2) a timely investigation, and (3) a good-faith basis for suspecting employee wrongdoing. But nothing in *Peltier requires* that a plaintiff be placed on leave pending the outcome of an investigation before we may conclude that the investigation was not an adverse employment action. We therefore decline to adopt Kuhn's argument on that point.

In the present case, Kuhn was never placed on leave, so he challenges only the investigation itself. But he has not shown that the investigation, during the time it was open, changed the form or conditions of his employment, let alone effected any change in a "materially adverse" way. He suffered no disciplinary action, demotion, or change in job responsibilities during the course of the investigation.

In addition, Kuhn does not cite, and we cannot locate, any cases that impose a good-faith requirement on the employer regarding internal investigations. Such an inquiry into the employer's subjective motive would be contrary to the objective analysis of whether an employment action is adverse. In any event, there is no evidence of bad faith in the present case because, under department policy, "[a]ny allegation of improper or inappropriate conduct by an employee . . . , *regardless of its apparent validity*, is a complaint or inquiry." (Emphasis added.) We thus find no error in the district court's conclusion that Kuhn failed to make out a prima facie case of race discrimination.

**D.    Kuhn's EEOC charge does not allege a hostile-work-environment claim**

The Equal Employment Opportunity Commission (EEOC) charge reads as follows:

> On May 30, 2008, I went on a medical leave. My medical leave was necessitated by discrimination occurring on the job. I filed a charge of discrimination against a Lieutenant in March 2009, and in October 2009, went to the County Administrator with my complaint. On January

4, 2010 I was discharged.  The reason given was economic conditions.
They stated several Deputies were cut.  I am aware of at least two (2)
white Deputies who were off work for longer periods of time than me,
who were not fired.

I believe I have been discriminated against by being discharged,
based on my race, black, my disability, and in retaliation for complaining
of discrimination, in violation of Title VII of the Civil Rights Act of
1964, as amended, and the Americans with Disabilities Act of 1990, as
amended.

Kuhn failed to check the box for "continuing action" and, in response to the prompt
"Date(s) discrimination took place," Kuhn listed only January 4, 2010—the date of his
termination.  The district court held that Kuhn's EEOC charge failed to put the EEOC
on notice of a hostile-work-environment claim because he alleged only distinct instances
of discrimination.  *Kuhn*, 2012 WL 1229890, at *8.

On appeal, Kuhn argues that his hostile-work-environment claim was properly
exhausted at the administrative level because it could reasonably be expected to grow
out of the EEOC charge. The County responds by pointing out that this argument was
never presented to the district court and is therefore waived.  In addition, the County
argues that Kuhn never presented any specific incidents of racially motivated
harassment.

Title VII protection extends to a plaintiff who shows that his or her workplace
"is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently
severe or pervasive as to alter the conditions of the victim's employment and create an
abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)
(citation and internal quotation marks omitted).  "As a general rule," however, "a Title
VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC
charge."  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).
Furthermore, inclusion in an EEOC charge of discrete acts of discrimination to support
a claim of disparate treatment cannot, standing alone, support "a subsequent, uncharged
claim of hostile work environment unless the allegations in the complaint can be

reasonably inferred from the facts alleged in the claim." *Id.* at 362 (internal quotation marks omitted).

Kuhn's complaint alleges that he was subjected to a hostile work environment based on (1) being assigned from 2005 to 2006 to Salem Township; (2) "experiencing" in 2006 the fact that African-American deputies, but not white deputies, were assigned to a locale where an African-American "suspect" had died; and (3) being subjected to an internal investigation by Lt. Anuszkiewicz. These allegations exceed the scope of the EEOC charge, which cites only discrete acts of alleged discrimination that occurred *after* Kuhn had taken medical leave.

And even if the allegations in the complaint could be reasonably inferred from the allegations in the charge, they fail to state a prima facie case for a hostile-work-environment claim. To establish such a prima facie case, Kuhn must show that (1) he was a member of a protected class; (2) he was subject to unwelcomed harassment; (3) the harassment was race-based; (4) the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the County was liable for the harassing conduct. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). The investigation in the present case was a one-time occurrence required by department policy. This is a far cry from the "severe or pervasive" standard articulated in *Harris*, 510 U.S. at 21. "A recurring point in the Supreme Court's opinions is that . . . isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment and that conduct must be extreme to amount to a change in the terms and conditions of employment." *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999) (internal quotation marks omitted). We therefore find no error in the district court's dismissal of Kuhn's hostile-work-environment claim.

**E.     Kuhn failed to establish a causal connection for purposes of his retaliation claim between his engaging in protected activity and being terminated**

Kuhn next asserts claims under both Title VII and Michigan's Elliott-Larsen Civil Rights Act (ELCRA) for retaliation. The analysis is the same under either act.

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) ("[T]he ELCRA analysis [for retaliation claims] is identical to the Title VII analysis."). In order to establish a prima facie case of retaliation, Kuhn was required to show that (1) he engaged in protected activity, (2) the County knew that Kuhn had exercised his civil rights, (3) the County took an adverse employment action against Kuhn, and (4) there was a causal connection between Kuhn's protected activity and the adverse employment action. *See Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

The district court assumed for purposes of analysis that Kuhn's August 2009 letter to County Administrator Guenzel and his September 2009 meeting with various County employees constituted protected activity. *Kuhn*, 2012 WL 1229890, at *9. Even with this assumption, however, the court held that Kuhn had not offered any evidence tending to show a causal connection between the protected activity and his termination. *Id.*

On appeal, Kuhn argues that "the timing and pretext surrounding [his] termination provide a genuine fact dispute on the issue of causation." He further contends that there is a causal relationship because the "County administrators' failed efforts" to speak with Kuhn about his allegations of deputy mistreatment could be viewed "as part and parcel of Kuhn's subsequent termination." The County correctly points out, however, that Kuhn failed to support these contentions with any evidence.

As did the district court, we will assume for purposes of analysis that Kuhn engaged in protected activity. If his August 2009 letter and the September 2009 meeting were protected activities, then the County indisputably knew about them. Equally irrefutable is the fact that the termination of his employment was an adverse employment action. But Kuhn has provided no evidence to establish any link between the protected activity and his termination several months later. The relatively short amount of time elapsed does not, by itself, imply causation. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim.").

Moreover, the events that transpired in this case do not support an inference of retaliation based on temporal proximity. This court has previously held that "an intervening legitimate reason" to take an adverse employment action "dispels an inference of retaliation based on temporal proximity." *Wasek*, 682 F.3d at 472 (holding that an oil rig worker who had complained about sexual harassment to his superiors, but who subsequently left his worksite without authorization, had engaged in an intervening event that gave his employer a legitimate reason to discipline him). Here, Kuhn's extended discretionary leave and his failure to return to work caused a shortage of available deputies in the Sheriff's Office and constituted an intervening reason for the County to terminate his employment. Furthermore, Kuhn failed to provide any evidence aside from temporal proximity that links his protected activity to his termination. We therefore find no error in the district court's dismissal of Kuhn's retaliation claim.

**F.     Kuhn cannot establish a claim under Michigan's Whistleblowers' Protection Act**

Section 2 of Michigan's Whistleblowers' Protection Act (WPA) provides as follows:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362. A "public body" includes "[a]ny . . . body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body." *Id.* § 15.361(d)(iv).

To establish a prima facie case under the WPA, Kuhn was required to show that (1) he engaged in protected activity as defined by the WPA, (2) he was discharged, and

(3) a causal connection existed between the protected activity and the discharge. *See Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 566 N.W.2d 571, 574 (Mich. 1997). The WPA contemplates three types of protected activity: "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998). Kuhn also had to show that the County received "objective notice of [his] report or a threat to report." *Roberson v. Occupational Health Ctrs. of Am., Inc.*, 559 N.W.2d 86, 88 (Mich Ct. App. 1996) (internal quotation marks omitted).

If Kuhn had been deemed successful in establishing a prima facie case, the burden would have shifted to the County to "establish a legitimate business reason" for terminating him. *See Shaw v. City of Ecorse*, 770 N.W.2d 31, 37 (Mich. Ct. App. 2009). The burden would then have shifted back to Kuhn to establish that the County's "proffered reasons were a mere pretext" designed to mask the true basis for his termination. *See id.*

Kuhn advances essentially the same argument with respect to his WPA claim as he did for his Title VII retaliation claim. The district court found that there was a genuine dispute of material fact as to whether Kuhn had engaged in protected activity when he sent an email to the County Administrator citing nonspecific incidents of deputy mistreatment. *Kuhn v. Washtenaw Cnty.*, No 10-11191, 2012 WL 1229890, at *10 (E.D. Mich. Apr. 12, 2012). It also found that Kuhn had stated that he would "follow up" on these allegations after the investigation against him was resolved (although Kuhn's actual email indicates that he planned to "follow up" after the investigation against *Lt. Anuszkiewicz* was resolved). *Id.*

The district court further found that "there was some indication that [the County was] worried that Kuhn would sue" over these concerns, leading the court to conclude that there was a genuine dispute as to whether Kuhn was about to report a suspected violation and whether this activity was the reason for his termination. *Id.* Ultimately, however, the court concluded that, because Kuhn's work restrictions were never lifted,

"Kuhn was not qualified to work at the time he was discharged" and was thus "unable to establish a *prima facie* case." *Id.* at \*11. It therefore dismissed Kuhn's WPA claim.

As an initial matter, whether a plaintiff is qualified to work is not part of his prima facie case under the WPA. The question of Kuhn's ability to return to work would be more appropriately considered as a legitimate business reason for terminating him.

But Kuhn was unable to establish a prima facie case in any event. As with his retaliation claims, temporal proximity alone "does not demonstrate a causal connection between the protected activity and any adverse employment action." *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 472-73 (Mich. 2003). Michigan courts have found, however, that temporal proximity, coupled with some other indication of termination on the basis of a protected activity, can satisfy the causation element. *See, e.g.*, *Henry v. City of Detroit*, 594 N.W.2d 107, 112-13 (Mich. Ct. App. 1999) (holding that an employee who presented evidence of temporal proximity between a protected activity and an adverse employment action, coupled with evidence of his supervisor's displeasure with the protected activity, satisfied the causation element of a prima facie case under the WPA).

The fact that Kuhn was terminated in January 2010 after stating in August and September 2009 that he was aware of instances of deputy mistreatment is evidence only of a temporal proximity between these events. To establish a prima facie case under the WPA, Kuhn was required to offer additional evidence from which a jury could infer that his intent to report the alleged mistreatment *influenced* the County's decision to terminate him.

He failed to offer such evidence. In fact, the evidence shows that the County was actively *encouraging* him to detail his allegations. The County administrators reached out to Kuhn and asked for his information so that they could investigate. Undersheriff Ptaszek, in granting Kuhn an extension of leave in November 2009, also requested "whatever information" Kuhn had. Kuhn was ultimately terminated because he had exhausted his permitted administrative leave and failed to return to work. "The fact that

a plaintiff engages in a 'protected activity' under the Whistleblowers' Protection Act does not immunize him from an otherwise legitimate, or unrelated, adverse job action." *West*, 665 N.W.2d at 473. We therefore find no error in the district court's dismissal of Kuhn's WPA claim.

**G.    Kuhn cannot establish that Lt. Anuszkiewicz tortiously interfered with a business expectancy**

Finally, Kuhn argues that the district court erred in dismissing his tortious-interference claim against Lt. Anuszkiewicz. To make out a prima facie case of tortious interference with a business expectancy under Michigan law, a plaintiff is required to show "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) (internal quotation marks omitted). A plaintiff must also "establish that the defendant was a 'third party' to the contract or business relationship." *Reed v. Mich. Metro Girl Scout Council*, 506 N.W.2d 231, 233 (Mich. Ct. App. 1993). The district court concluded that Lt. Anuszkiewicz was not a third party to Kuhn's employment relationship with the County because the lieutenant was acting for the benefit of the Sheriff's Office. *Kuhn*, 2012 WL 1229890, at *11.

On appeal, Kuhn argues that reasonable minds could conclude that Lt. Anuszkiewicz was effectively a "third party" because he was motivated by a "personal vendetta" when he opened the internal investigation into the rape claim. He contends that the Sheriff's Office had previously investigated an assault involving Lt. Anuszkiewicz's brother, who was also employed by the Sheriff's Office, and that Commander Hall-Beard had given nothing more than a verbal warning to the brother. But Kuhn fails to explain why a departmental investigation involving Lt. Anuszkiewicz's brother would cause Lt. Anuszkiewicz to have a vendetta against Kuhn.

Moreover, well-established Michigan law holds that "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely

for their own benefit with no benefit to the corporation." *Reed*, 506 N.W.2d at 233. Kuhn does not dispute that the internal investigation was required by department policy. Nor did he present any evidence showing that Lt. Anuszkiewicz acted solely for the latter's own benefit. We thus find no error in the district court's conclusion that Lt. Anuszkiewicz was acting pursuant to his duties as required by the Washtenaw County Sheriff's Office when he opened the internal investigation into Joseph's rape claim.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.