NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0413n.06

No. 24-5981

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 02, 2025
KELLY L. STEPHENS, Clerk

JEFFREY W. HOWARD,

    Plaintiff-Appellant,

v.

CHEROKEE HEALTH SYSTEMS,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

Before: WHITE, LARSEN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. For decades, Jeff Howard served as the chief financial officer for Cherokee Health Systems. Howard worked under Dennis Freeman, Cherokee's longstanding chief executive officer. When Freeman announced his retirement plans, Howard approached him about applying to be the next CEO. But Freeman recommended a different candidate. Howard applied anyway, so Freeman fired him. Howard claims that Freeman took this action because he wanted a female to replace him. And Howard alleges that Cherokee's board refused to consider him because his counsel sent a letter complaining about Freeman's alleged sex discrimination. Yet Howard failed to produce enough evidence to show that Cherokee's neutral reasons for these decisions were pretextual. We thus affirm the grant of summary judgment to Cherokee.

I

In the late 1970s, Cherokee Health Systems "was a small mental health organization" that had "33 employees" at a single location in Morristown, Tennessee. Letter, R.20, PageID 203.

Dr. Dennis Freeman became Cherokee's CEO in 1978. He served in that role for the next four decades. During his tenure, this nonprofit healthcare provider grew to "employ 700 staff and maintain two dozen offices in locations in both east and west Tennessee." *Id.* It now offers many medical services—including "primary care, behavioral health, dental, and pharmacy services"—"to the underserved population." Carpenter Aff., R.12, PageID 82.

Howard took a college internship with Cherokee. After his graduation, he worked off and on for the company. Freeman hired Howard as Cherokee's CFO around the year 2000. Howard stayed in that position for over twenty years.

By 2019, speculation began to grow over who would replace Freeman as CEO when he stepped down. Freeman first wanted Joel Hornberger, who served as the chief strategy officer, to serve as his successor. But Hornberger felt he was too old for the job and did not want to lead the entire organization anyway. As for Howard, he conceded in a 2019 email to Freeman that, while he "used to want to try my hand as CEO," he was "probably not the best choice." Email, R.12, PageID 102. Howard instead proposed Dr. Parinda Khatri, Cherokee's chief clinical officer, as Freeman's replacement. He also suggested that Freeman make Khatri the deputy CEO. But Freeman declined this latter proposal.

Two years later, the time came for Freeman to pass the torch. In October 2021, he told Cherokee's board of directors that he would retire effective January 31, 2022. As the years progressed, Freeman had started to express a preference for a "clinician"—not an administrator—to stay in the role of CEO. Howard Dep., R.12, PageID 130. He also came to believe that a "financial person" would not make a great head of Cherokee. *Id.*, PageID 135. So when he announced his retirement, he recommended that the board replace him with Dr. Khatri—the same

candidate that Howard had recommended earlier. Khatri's hire also would adhere to the board's succession plan, which favored candidates "internal" to Cherokee. Plan, R.20, PageID 239.

At this time, though, Howard had a change of heart over whether he wanted to be CEO. On October 28, he approached Freeman to ask whether he could apply for the position. Howard and Freeman had different recollections of this conversation. Howard thought that Freeman condoned his request to apply while expressing his continued preference for Khatri. But Freeman thought that Howard had promised not to disrupt the succession process that Freeman had put in place. Indeed, Howard later admitted that Freeman "thought I promised something that I didn't promise": that he would not apply for the CEO position. Howard Dep., R.12, PageID 132.

The next day, Howard began to lay the groundwork for his application. He emailed two members of Cherokee's board of directors to informally let them know his interest in replacing Freeman. He also sought to be "open" with Khatri about his intent. Email, R.12, PageID 103. He alerted her in another email that he planned to apply and that the two would unfortunately be "competing" against each other. *Id.*

This email did not go over well. Khatri responded with only four words: "I am in shock." Khatri Dep., R.12, PageID 146. She also refused to respond to Howard's follow-up emails. But Khatri did let Freeman know about Howard's plans. Freeman asked to see Howard's email. After forwarding it, Khatri complained that Howard had "create[d] division at" Cherokee by going "against" Freeman's "plan." Text, R.20, PageID 205. She also expressed concern about what she believed to be the finance department's underperformance.

Freeman fired Howard a few days later. In Freeman's termination letter, he explained that Howard's "self-serving actions" had alienated the leadership team, threatened dissension, and violated Howard's assurances that he would not disrupt the transition. Letter, R.12, PageID 106.

In notes "to the record," Freeman suggested that Howard had promised that he would not apply "unless the Board open[ed] up the process" after it passed over Khatri. Notes, R.12, PageID 109. Freeman thus thought that Howard had lied.

In November, Howard's lawyers sent a letter to the chair of Cherokee's board accusing Freeman of firing Howard out of a desire to ensure that Khatri, a woman, became the CEO. The lawyers suggested that Freeman had engaged in illegal sex discrimination. They asked the board to consider Howard for the CEO position and attached a cover letter and resume from Howard with the correspondence.

This letter caused board members to disagree over how to proceed. One member, Nancy Sirianni, worried that Howard would sue Cherokee if he did not become CEO and suggested that they refer the matter to counsel. Another, Michael Covington, suggested that Howard may have a "viable case" and that he would like "to gain the perspective of other candidates before committing to a handpicked successor." Emails, R.12, PageID 114, 116. He also called Khatri to discuss her application. When he brought up Howard's termination, Khatri "had a meltdown on the phone." Covington Dep., R.20, PageID 198. She could not talk about the matter, which gave Covington concerns about how she would handle a crisis as CEO. Yet Freeman had a "real problem" with Covington's decision to call Khatri and "lashed" out that the board should speak only with Freeman rather than his staff. *Id.*, PageID 197, 201. Covington had to remind Freeman that he was not Freeman's "subordinate" and that Freeman instead served at the board's pleasure. *Id.*, PageID 197.

Ultimately, though, the board's chair (Ken Knight) moved forward with the "succession plan" that the board had approved. Email, R.12, PageID 117. In early January 2022, a search committee made up of several board members interviewed Khatri and came away "favorably

impressed" with her. Knight Aff., R.12, PageID 91. They recommended that the board hire Khatri without interviewing others, especially because she remained the only internal candidate. The full board decided to hire her on January 25.

Howard sued Cherokee under Title VII and Tennessee law. The district court granted summary judgment to Cherokee. *See Howard v. Cherokee Health Sys.*, 2024 WL 4350330, at *9 (E.D. Tenn. Sept. 30, 2024). We thus must review its opinion de novo. *See Smith v. Newport Utils.*, 129 F.4th 944, 948 (6th Cir. 2025).

## II

Title VII and Tennessee law prohibit employers from discriminating against employees because of their sex and from retaliating against them for complaining about this discrimination. *See* 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); Tenn. Code Ann. §§ 4-21-301(a), 4-21-401(a). Howard alleges that Cherokee engaged in both discrimination and retaliation here. Yet he lacks enough evidence to raise a jury issue for either claim under Title VII. The parties also do not dispute that Tennessee law follows the same framework as Title VII. *Cf. Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022); *Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 381 (Tenn. 2014). So we may assume the point on appeal and need not separately address Tennessee law.

### A. Sex Discrimination

Title VII makes it illegal for an employer "to discharge any individual" "because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a). Howard alleges that Freeman violated this ban by firing him to ensure that Khatri became Freeman's successor. In support of this theory, Howard presented evidence about Freeman's general record as CEO. According to Howard, "[t]here were certain females that would get [Freeman's] attention, and they became protected." Howard Dep., R.12, PageID 125. Which women? Howard suggested that Freeman would protect those he

5

viewed as "attractive" and would "bash" those he did not. *Id.*, PageID 125–26. And if another employee "crossed" one of these protected females, Howard asserted, Freeman "would find a way to get rid of" the employee. Garner Tr., R.20, PageID 213. Howard also offered a few examples of Freeman's alleged sex discrimination. Freeman met and began dating his second wife while she worked at Cherokee. Cherokee also settled a case brought by a different female employee who alleged that Freeman had sexually harassed her. And after an interview with another female applicant, Howard allegedly overheard Freeman say: "I don't know whether to hire her or date her." Howard Dep., R.20, PageID 220. Finally, Howard testified that Freeman did not give male therapists a "seat at the table" and rarely promoted them. Appellant's Br. 17.

We analyze Title VII claims based on this type of indirect evidence of discrimination using the burden-shifting approach from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025). Employees must first make out a "prima facie case" of sex discrimination. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Employers must then identify a neutral justification for the challenged personnel action unrelated to one of the traits (such as sex) that Title VII protects. *See id.* at 308–09. Employees must lastly create a genuine issue of material fact over whether this justification was a "pretext" designed to hide the employer's discrimination. *Id.* at 309 (quoting *McDonnell Douglas*, 411 U.S. at 804).

To establish a prima facie case of sex discrimination, our caselaw generally requires employees to show that they belong to a protected group; that they suffered an adverse employment action; that they were qualified for the relevant position; and that someone outside the protected group obtained the position or otherwise received more favorable treatment. *See, e.g.*, *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023); *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). At one time, we also held that employees who belonged to so-called "majority" groups

(such as men) had to present additional evidence that their employer was the "unusual" one that "discriminates against the majority." *Ames*, 605 U.S. at 309 (citation omitted). And the district court here reasonably relied on our special rule for these so-called majority groups when it held that Howard failed to make out a prima facie case of sex discrimination. *See Howard*, 2024 WL 4350330, at *5–6. In *Ames*, however, the Supreme Court rejected this rule by holding that all employees must satisfy the same prima facie case. *See* 605 U.S. at 309–13.

That said, we may affirm the district court's decision on alternative grounds. Cherokee argues that Howard did not establish his prima facie case even apart from the rule that *Ames* rejected. Howard conceded that Freeman favored *only* "certain women" that he found attractive and disfavored other women that he did not. Howard Dep., R.12, PageID 125–26. According to Cherokee, a supervisor's preference for a subset of women (over all other women and all men) does not count as "sex" discrimination under Title VII. As support for this view, Cherokee points to out-of-circuit precedent holding that supervisors do not engage in sex discrimination if they give preferential treatment to a "sexual or romantic partner" over all other male and female subordinates. *Maner v. Dignity Health*, 9 F.4th 1114, 1119–27 (9th Cir. 2021); *see, e.g.*, *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002); *DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.2d 304, 306 (2d Cir. 1986). At least one of these courts has kept to this view even after the Supreme Court interpreted the phrase "because of . . . sex" broadly to cover all employment actions in which sex is a but-for cause. *See Maner*, 9 F.4th at 1122 (applying *Bostock v. Clayton County*, 590 U.S. 644, 659–60 (2020)). Although Freeman did not have a sexual relationship with Khatri, Cherokee argues that the logic of these cases shows that Title VII does not forbid employers from giving preferences to a *subset* of a protected group (such as a subset of women or men).

Yet consider how Cherokee's theory would apply more generally. The Supreme Court has held Title VII's ban on discrimination "because of . . . sex" covers harassment against employees of one sex if the harassment is sufficiently severe. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–82 (1998). Extending Cherokee's theory to the harassment context, could an employer avoid liability if a male supervisor intentionally targeted only *certain* women (rather than all women) for harassment? Cherokee did not adequately explain how its argument differs from that one. The company also did not attempt to apply the but-for causation test from the Supreme Court's decision in *Bostock*. *Cf. Maner*, 9 F.4th at 1122. We thus opt not to base our decision on this issue.

Even if Howard established a prima facie case, Cherokee responded by identifying a neutral reason for his termination. Freeman fired Howard because he found that Howard's "self-serving" decision to apply for the CEO position had "alienated [Howard] from all other members of the leadership team, run the risk of creating [dissension] among the staff, and violated assurances given to [Freeman] a few hours earlier." Termination Letter, R.12, PageID 106. And as the district court also held, Howard failed to show that these reasons for terminating Howard were pretext for sex discrimination. *See Howard*, 2024 WL 4350330, at *6–7.

To start, Howard lacks evidence from which a reasonable jury could find that Freeman preferred Khatri to be the next CEO because she was a woman (or because Howard was a man). To the contrary, plenty of evidence shows that their sex had nothing to do with Freeman's preference for Khatri. Howard, for example, conceded that Joel Hornberger (another male employee) had once been Freeman's "first choice" to replace him. Howard Dep., R.12, PageID 131. If Freeman wanted a woman as his successor, it would have made no sense for Hornberger to have been his first choice. Next, Howard conceded that Freeman eventually changed his mind

by wanting a "clinician" as his successor. *Id.*, PageID 130. Khatri was a clinician while Howard was not. Lastly, Howard conceded in a 2019 email that Khatri should replace Freeman and that Howard was "probably not the best choice." Email, R.12, PageID 102. So Howard's own beliefs (at least at one time) showed that merit—not sex—drove Freeman's recommendation.

Next, plenty of evidence illustrates that Freeman fired Howard because Freeman thought that Howard had lied to him and thereby caused dissension among the staff. Freeman listed these reasons in Howard's termination letter and in contemporaneous notes. And while Howard disavowed telling Freeman that he would not apply to be the next CEO, Howard conceded that Freeman "*thought* [Howard had] promised" that he would not apply. Howard Dep., R.12, PageID 132 (emphasis added). Freeman's "honest belief" that Howard had lied suffices to rebut any pretext claim, even if the belief were factually mistaken. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). In sum, no evidence suggests that Freeman would have retained Howard if his preferred candidate had been a male (or if Howard had been a female).

In response, Howard cites three pieces of evidence that (he says) undermine Freeman's justifications for the termination. Howard first asserts that Freeman and other female employees (including Khatri) had an "emergency meeting about firing Howard" on the same day that Howard sent his email to Khatri disclosing his interest in the CEO position. Appellant's Br. 18. Yet Howard fails to explain why this meeting suggests that Freeman's reasons for firing him were pretextual. If anything, the meeting supports Freeman's conclusion that Howard's decision to apply for the CEO position had troubled other members of the leadership staff.

Howard next highlights Covington's testimony that Freeman had not been "honest" with Covington about why he fired Howard. *Id.* But Covington (a board member far removed from Cherokee's day-to-day operations) did not have any personal knowledge of Freeman's reasons for

the termination. *See McKinley v. Skyline Chili, Inc.*, 534 F. App'x 461, 468 (6th Cir. 2013); *see also Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 841 (6th Cir. 2021). Besides, Covington believed that Freeman fired Howard to "make sure [Khatri] got the CEO position[.]" Covington Dep., R.20, PageID 202. Even if true, this fact would not show that Freeman engaged in improper sex discrimination. Again, Howard lacks evidence that Freeman preferred Khatri because of her sex rather than, say, her medical credentials.

Lastly, Howard emphasizes that he received "stellar" performance reviews. Appellant's Br. 18. But Freeman did not fire Howard for his job performance as CFO. Freeman fired Howard because he chose to apply for CEO after (according to Freeman) he pledged not to disrupt the succession plan. So Howard's past performance was beside the point.

In the end, Freeman may have acted impulsively by firing a longstanding officer merely for expressing an interest in the CEO role. But Title VII does not protect against poor business decisions. *See Adams v. Tenn. Dep't of Fin. & Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006). And Howard failed to produce any evidence suggesting that his (or Khatri's) sex mattered to his termination.

## B. Retaliation

Title VII also makes it illegal for an employer "to discriminate against any" employee because the employee "has opposed any practice" that the law makes "an unlawful employment practice[.]" 42 U.S.C. § 2000e-3(a). Howard suggests that Cherokee violated this ban "by refusing to consider him for the CEO position" because his lawyers had complained to the board that illegal sex discrimination had motivated his termination. Appellant's Br. 19.

When considering this type of retaliation claim, we follow a burden-shifting approach like the one that governs Howard's discrimination claim. *See Kirkland*, 54 F.4th at 910. Howard must

satisfy a prima facie case by showing that he engaged in protected activity; that Cherokee knew of this activity; that it took an adverse action against him; and that a "causal connection" exists between his "protected activity and the adverse action." *Id.* Cherokee must then identify a neutral, "nonretaliatory reason for the adverse action"—here, its failure to consider Howard to be the next CEO. *Id.* Howard must lastly show that this identified reason "was pretextual" and that retaliatory animus was a but-for cause of Cherokee's refusal to consider him. *Id.* at 911.

As with Howard's discrimination claim, we need not resolve whether he established a prima facie case of retaliation because Cherokee has identified a neutral reason for its refusal to interview him for the CEO role. The board did not consider Howard because Freeman had just fired him and, as the chair explained, they "trusted that Dr. Freeman wouldn't have terminated someone for no cause." Knight Dep., R.12, PageID 151. Howard's termination also left only one "internal" candidate (Khatri), and the succession plan called for the search committee to give preference to such candidates. Plan, R.20, PageID 239. The board chair thus chose to continue "moving forward" with this plan by interviewing the "in-house candidate first." Email, R.12, PageID 114, 117. And once the committee interviewed Khatri, it was sufficiently "impressed" by her to recommend her hire without interviewing other candidates. Knight Aff., R.12, PageID 91.

In response, Howard has not identified evidence from which a reasonable jury could find that Cherokee's justification was "pretextual" and that the board failed to consider Howard because of his counsel's letter. *Kirkland*, 54 F.4th at 910. Howard first points to the temporal proximity between the alleged protected activity (his lawyers' letter to the board chair on November 22, 2021) and the adverse action (the board's decision to hire Khatri on January 25, 2022). But these events occurred months apart. And Freeman had already fired Howard when his counsel sent the letter, so it would not have made sense to interview him for the CEO position. In all events, we

have "rarely" held that "temporal proximity" alone can create a genuine issue of material fact over an employer's motives for an adverse action. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010); *see Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013). This case is no exception.

Howard next points to the email that Nancy Sirianni (a board member) sent to her fellow board members about the letter from Howard's counsel. She expressed concern that Howard might sue and suggested that they should not "interview" Howard because "it would give [him] even more grounds" to believe "that he was wrongfully terminated." Email, R.12, PageID 119. As she asked, what rational company "would bring back an employee rightfully terminated for cause to interview for CEO"? *Id.*, PageID 120. She thus did not recommend that they avoid Howard because of his counsel's letter. She recommended that they avoid him because he had just been fired, and an applicant terminated for cause should not get a promotion. Regardless, Sirianni was not on the search committee and had little involvement in choosing the applicants to consider.

Howard lastly points to an email from Ken Knight (the board's chair) suggesting that the board "first" consider Khatri before interviewing others. Email, R.12, PageID 114. According to Howard, this email shows that Knight acted with pretext because his proposed course "abandoned the succession plan that" the board had adopted. Appellant's Br. 19. Howard's claim conflicts with the undisputed record. The succession plan told the board to give "strong consideration . . . to internal candidates who are interested in the position." Plan, R.20, PageID 239. Knight's email adhered to this plan because Khatri remained the only internal candidate left when Knight sent it. And his decision to follow the plan confirms that a neutral justification supported the refusal to consider Howard for the CEO position.

We affirm.

12