RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LaNetra Kellar,

                *Plaintiff-Appellant*,

    *v.*

The Yunion, Inc.,

                *Defendant-Appellee*.

No. 25-1136

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:21-cv-12133—F. Kay Behm, District Judge.

Decided and Filed:  October 31, 2025

Before:  GIBBONS, McKEAGUE, and RITZ, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  Carla D. Aikens, CARLA D. AIKENS, P.L.C., Detroit, Michigan, for Appellant.
Todd Russell Perkins, PERKINS LAW GROUP, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

McKEAGUE, Circuit Judge.  LaNetra Kellar sued her former employer, The Yunion, Inc. ("Yunion"), for discrimination, retaliation, and wrongful termination.  The district court granted summary judgment to Yunion, dismissing the case.

In Kellar's appeal, she challenges nearly all of the district court's conclusions.  But because she did not present sufficient evidence to survive summary judgment, we **AFFIRM**.

## I. BACKGROUND

Yunion is a nonprofit organization that provides educational programming and family services to at-risk youth in the Detroit area. As is the case for many nonprofits, Yunion relies on grants and public funding to operate. Yunion had a relationship with Wayne County, Michigan that was particularly important. Through three contracts with Wayne County, Yunion was able to fund its diversion department, the sector of Yunion's operations that supported students with an elevated risk of interacting with the juvenile justice system. Yunion performed its services and obtained funding from Wayne County through a reimbursement structure—the more services Yunion performed, the more funding it would receive. While Yunion historically relied on independent contractors to provide its services, in 2018, Yunion and Wayne County implemented a new program model that would fund a full-time case manager position for the diversion department. Yunion relied on projected Wayne County reimbursements to maintain this position.

Enter LaNetra Kellar. Kellar had been an independent contractor with Yunion, serving as an educator. When the full-time case manager position opened, Kellar applied and got the job. In this new role, Kellar monitored the students who worked with the diversion department and helped direct them to community resources. Kellar was a strong employee who did not experience issues with her performance. Nonetheless, conflict arose.

### A. Kellar's Health Concerns and Accommodation Request

The origin of Kellar's lawsuit against Yunion dates back to May 2019, when Yunion's office building flooded. A pipe burst on the second floor of Yunion's building, which caused considerable water damage to the floors below. The building needed professional cleaners to remediate potentially hazardous conditions.

Nicole Wilson, Yunion's Executive Director, sought to alleviate employee anxieties. She emailed Yunion's staff to assure them that, according to the building director, the environment was safe. She encouraged everyone to "continue to communicate [their] concerns" and offered to provide alternative office space in the building for those who would feel more comfortable

working on a different floor.  Email from Nicole Wilson, Exec. Dir. of Yunion, to Yunion Staff (June 18, 2019 at 09:18 AM), R.15-7 at PageID 441.

Despite this assurance from Wilson that the office building was safe, Kellar was unconvinced.  Kellar first articulated her skepticism about the building's safety by replying-all to Wilson's staff email, noting that the air purifiers in use throughout the building typically indicate the presence of mold and asbestos.  Days later, in a statement forwarded to the email chain, the environmental company that was hired to fix the damage declared the building safe for business as usual, with any hazards "under full containment."

Over the next few months, Kellar periodically renewed her concerns about building safety to Wilson. Kellar observed "visible signs of water damage in the ceilings on the second and lower levels."  Email from LaNetra Kellar, Yunion Case Manager, to Nicole Wilson, Exec. Dir. of Yunion (Sep. 18, 2019 at 08:10 AM), R.15-7 at PageID 447.  Kellar also alerted Wilson to her "runny and stuffy nose, sore throat, sinusitis[,] and headaches," symptoms that she felt "on at least three separate occasions" over the course of the last couple days.  *Id.*  Kellar concluded that the building's air quality was to blame for her ailments, notifying Wilson of her plan to be out of the office for the day.  *Id.*

The following Monday, Eric Reed, Yunion's Director of Operations, sent Kellar documents that explained the building was safe, and he informed her that if she were to continue working remotely as an accommodation for a medical condition, she would need to provide a doctor's note.[1]  Kellar remained unsatisfied.  She challenged the findings in the documents and informed Reed that she would continue to work remotely.  She also told him that she would obtain a doctor's note.  A couple days later, Kellar sent Reed a letter from Dr. Kathleen J. Dass that stated in its entirety:

---

[1]There were times when Kellar was able to work remotely before she raised her health concerns, but only on a periodic basis.  If an employee's health-related request for remote work or medical leave exceeded three days, Yunion would request a doctor's note.

> To Whom It May Concern:  LaNetra has evidence of allergic rhinitis, vocal cord dysfunction, and possible developing allergic asthma.  Mold is one of her triggers, and she should not have mold exposure, as this may worsen her symptoms.  If you have any questions, please do not hesitate to call my office.

Sep. 29, 2019 Doctor's Note, R.15-7 at PageID 452.  Reed forwarded the letter to Wilson.

Wilson was not satisfied with this doctor's note, as it did not explicitly say that Kellar needed to work remotely.  Wilson informed Kellar that she would need to come into the office for in-person work unless she provided a "specific letter from [her] doctor stating that [she] cannot work from the building."  Email from Nicole Wilson, Exec. Dir. of Yunion, to LaNetra Kellar, Yunion Case Manager (Oct. 14, 2019 at 07:53), R.15-7 at PageID 455.

Kellar remained undeterred; she informed Wilson and Reed that she was not comfortable coming back to the building, and she would use her vacation-day allotment until she was able to obtain sufficient medical justification to work remotely.  In response, Wilson let Kellar know that if she were to work remotely, she would be shifted to part-time work, explaining that around 50% of her responsibilities were case file management, which had to be conducted in the office.  Wilson also informed Kellar that there would be a staff meeting to discuss the new environmental reports that confirmed the building was safe.  When Kellar asked if she could attend remotely, Wilson replied that there were no virtual options, and that the expectation was for all staff to attend onsite.

Subsequently, Kellar provided a second doctor's note from Dr. Dass.  The note stated that Dr. Dass "would recommend" Kellar work offsite from Yunion's office building.  Oct. 15, 2019 Doctor's Note, R.15-7 at PageID 461.  The note did not say that offsite work was medically necessary.  Kellar also arranged an offsite meeting with Reed to discuss the findings of the new environmental reports.

After reviewing the new reports, Kellar still did not feel comfortable returning to the office, so she emailed Reed to inquire about an accommodation.  As part of her accommodation request, Kellar acknowledged that she would be unable to perform her onsite case file management duties, so she suggested Reed direct some of Yunion's Wayne State University School of Social Work interns to take on her filing responsibilities without needing to hire a new

staff person.  Reed informed Kellar that the interns could not handle her onsite filing because they had their own caseloads to manage.  He then forwarded Kellar's request to Wilson with a "shrug" emoji.

In the midst of these email exchanges over Kellar's accommodations, Wilson mistakenly sent Kellar a text insinuating that Kellar would be fired.  Wilson was hoping to acquire contact information for Kellar's sister—Phyllis—who was on Yunion's Board of Directors.  Wilson asked Kellar for Phyllis's phone number; then, one minute later, Wilson texted Kellar again, saying: "Hope her sister will still be on our board after I fire her [shrug emoji]."  Text Messages, R.20-43 at PageID 919.  Wilson did not realize that she had mistakenly texted Kellar until the discovery phase of this litigation.  Wilson explained that the text was intended for Reed, prompted by Kellar's perceived unexcused absences at the office.

Kellar eventually responded to the text with Phyllis's number, not acknowledging the message about potential termination.  Kellar also sent an email to Wilson and Reed outlining the history of her health concerns and accommodation requests, asking, once again, for an accommodation to work remotely.  In response, Wilson granted Kellar's request to work from home, implementing the previously discussed plan to shift Kellar to part-time work so Yunion could hire someone to handle her onsite case file management duties.  But Wilson also clarified that this accommodation would be temporary, and once Yunion provided additional test results that proved the building did not present any health hazards, Kellar would need to return to in-person work onsite.

Kellar worked remotely as a part-time employee for approximately three weeks.  While Kellar worked remotely, Yunion increased another employee's hours to compensate for Kellar's unfulfilled onsite case file management duties.

Wilson and Reed were particularly concerned with ensuring an employee took on Kellar's case file management responsibilities because the organization was preparing for an onsite file audit from Wayne County.  Yunion's contract with Wayne County required onsite, hard copies of each case file, subject to audit.  Because Yunion's funding was conditioned on satisfactory Wayne County audits, Yunion case managers would conduct biweekly reviews of

their files. These hard-copy-file reviews "had to be done on-site." Reed Dep., R.15-4 at PageID 283; *see also* Kellar Dep., 15-2 at PageID 149 (recognizing that in order to ensure the hard copies were complete and accurate, the case managers had to go onsite to the cabinets where the files were located). Kellar agreed that onsite file management was an "important" part of the case manager job. Kellar Dep., R.15-2 at PageID 143.

When Reed presented Kellar with additional documentation about the remediation efforts, Kellar returned to in-person, full-time work. In November 2019, seemingly disgruntled by the negotiation over her request to work remotely, Kellar filed a complaint with the Michigan Occupational Safety and Health Administration, alleging discrimination. She claimed Reed and Wilson reduced her hours in retaliation for raising concerns about the building's safety. Around this time, Kellar also filed a disability-based discrimination complaint with the Michigan Department of Civil Rights, but that claim was eventually closed.

**B. Kellar's Additional Complaints**

Moving forward, Kellar did not report any additional health concerns, and in the start of 2020, Yunion moved to a new office building. But in the summer and early fall of 2020, Kellar filed additional complaints against her Yunion supervisors.

First, in July 2020, Kellar filed a complaint with the Michigan Department of Labor alleging Reed had failed to reimburse her for mileage. Responding on behalf of Yunion, Wilson explained—both to Kellar and the Michigan Department of Labor—that an employee would have to travel to a location that is at least 15 miles (one way) from Yunion's headquarters to receive reimbursement for mileage. Kellar withdrew the matter a few weeks later.

Then, in September 2020, Kellar filed another complaint with the Michigan Department of Labor because she did not receive paystubs for a period of three months. The Michigan Department of Labor notified Yunion of this complaint on September 30, 2020. A few weeks later, Wilson, again responding on behalf of Yunion, informed the Michigan Department of Labor that, moving forward, the company would make paystubs available for all of its employees through its payroll vendor. By mid-November, the complaint was considered resolved and closed.

### C. COVID's Impact on Yunion

Due to the pandemic, Yunion's diversion department took a significant financial hit. Schools and families were reluctant to participate in Yunion's programing, and as case managers' client portfolios plummeted, so too did Yunion's reimbursement revenue from Wayne County. Kellar's workload was indicative of Yunion's struggles. Kellar was responsible for 50 students in the first quarter of 2020, but by the end of the second quarter, her client list had decreased to 16 students. With fewer services to provide—and fewer reimbursements to collect—the diversion department received only 47.5% of its projected fiscal year 2020 budget.

During the pandemic, Yunion tried to shift operations to accommodate the remote-working world. Case managers started providing some virtual services to students, and Yunion created staggered schedules to limit interactions with other staff during onsite case file management responsibilities. Taking advantage of additional public funds, Yunion applied for, and received, a federal Paycheck Protection Program loan in an effort to retain employees through these challenges. But the financial difficulties loomed large.

### D. Kellar's Relationship with Yunion Ends

In September 2020, Wayne County informed Yunion that it could no longer provide any virtual services. Because many families were not ready to participate in face-to-face programming, Yunion anticipated an even greater decrease in reimbursement revenues for the diversion department. So Yunion decided to shift Kellar's full-time position to an independent contractor position. This reclassification would standardize the diversion department and save Yunion money; all the case managers would be independent contractors, and with this change, Yunion could at least retain all its employees in some capacity. But for Kellar, it meant she would be paid on an hourly scale instead of a salary, and she would work less (at most 25 hours per week as opposed to her full-time 40-hour weeks). She would also lose her employee benefits and holidays.

Yunion presented Kellar two options: she could either accept the independent contractor role or accept a severance package that provided 12 weeks of her full salary and insurance coverage. Kellar did not accept either option, which effectively terminated her employment

relationship with Yunion. According to Kellar, she thought the independent contractor offer did not provide enough stability, and she felt her work-related disputes with Yunion were harassing and discriminatory. She did not accept the severance package because it included a clause that released Yunion of any liability related to employment disputes.

Kellar filed a lawsuit against Yunion claiming discrimination, retaliation, and wrongful termination under federal and state law. Yunion filed a motion for summary judgment on all of Kellar's claims, which the district court granted in its entirety. Kellar timely appealed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant bears the initial burden of demonstrating that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden then shifts to the non-movant, who must cite specific evidence indicating that a genuine dispute of material fact exists. *Id.* at 324; *see also* Fed. R. Civ. P. 56(c), (e). We view the facts and draw inferences in favor of the non-movant, *Taylor v. City of Saginaw*, 11 F.4th 483, 486-87 (6th Cir. 2021), but the non-movant must provide more than a mere "'scintilla' of evidence to support its claims." *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024) (quoting *Anderson*, 477 U.S. at 252). We review the district court's legal conclusions de novo and its factual findings for clear error. *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 485 (6th Cir. 2025).[2]

---

[2]Some of Kellar's claims require analysis via the *McDonnell Douglas* burden-shifting framework. Kellar argues that we should consider Justice Thomas's dissent from the denial of certiorari in *Hittle v. City of Stockton*, 145 S. Ct. 759, 759-61 (2025), which questions both the wisdom of this burden-shifting approach and whether its preponderance standard is consistent with Federal Rule of Civil Procedure 56. We are bound by precedent that applies the *McDonnell Douglas* framework in this manner. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981).

### III.  ANALYSIS

Kellar raises five issues on appeal, arguing that the district court erred by granting Yunion summary judgment on (1) her disability-based hostile-work-environment claims; (2) her disability-based adverse-employment-action claims; (3) her failure-to-accommodate claims; (4) her disability-based and whistleblower-based retaliation claims; and (5) her wrongful termination claim.

### A.  Disability-Based Discrimination Claims

Under the Americans with Disabilities Act ("ADA"), employers cannot "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  As stated in the statute, this prohibited discrimination can take many forms.  Employers cannot make "hiring and firing" decisions (or other discrete adverse employment decisions) based on an individual's disability.  *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (citing 42 U.S.C. § 12112(a)); *see also Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023).  Nor can employers refuse to make "reasonable accommodations" for their disabled employees. *Hostettler*, 895 F.3d at 852 (quoting 42 U.S.C. § 12112(b)(5)(A)).  Additionally, courts recognize hostile-work-environment claims under the anti-discrimination provisions of the ADA. *Bryant v. McDonough*, 72 F.4th 149, 151-52 (6th Cir. 2023) (order) (citing *Plautz v. Potter*, 156 F. App'x 812, 818 (6th Cir. 2005) (per curiam) (recognizing that the elements for a hostile-work-environment claim are consistent across the various anti-discrimination statutes)).

While Kellar blends her arguments together at times, she sued Yunion for disability-based discrimination under each of these three distinct causes of action.  First, Kellar claims she was subjected to a hostile work environment at Yunion due to her disability.  Second, she argues Yunion engaged in adverse employment actions against her based on her disability.  Finally, she claims Yunion failed to provide her with reasonable accommodations as is required for qualified disabled persons.  Kellar brought these claims under federal law via the ADA, and state law via

Michigan's Persons with Disabilities Civil Rights Act.[3]  On appeal, she argues that the district court erred in granting summary judgment in favor of Yunion on each claim.  We disagree.

### 1.  Hostile-Work-Environment Claims

Kellar claims she was subjected to a hostile work environment due to her disability because Yunion denied her mileage reimbursement request, failed to timely provide paystubs, reduced her hours and rate of pay, revoked her benefits and paid holidays, and sent her a text insinuating she would be fired.

The hostile-work-environment cause of action allows a plaintiff to sue for discrimination when "sufficiently abusive harassment adversely affects a 'term, condition, or privilege' of employment."  *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (citing *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir. 1991)).  Just like Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and other statutes that comprise the "wider statutory scheme [that] protect[s] employees in the workplace nationwide," *id.*, the ADA and Michigan's disability civil rights law prohibit discrimination that affects the "terms, conditions, or privileges of employment."  42 U.S.C. § 12112(a); Mich. Comp. Laws § 37.1202(1)(b).

Given the analogous statutory language and elements, courts look to the principles that generally govern hostile-work-environment claims as a guide to address hostile-work-environment claims arising under other workplace anti-discrimination statutes—so long as those statutes contain the parallel "terms, conditions, or privileges of employment" language.  *See, e.g.*, *Bryant*, 72 F.4th at 151-52 (quoting *Plautz*, 156 F. App'x at 818 (borrowing the hostile-work-environment framework from Title VII for a disability-based claim, and recognizing that the elements for a hostile-work-environment claim are consistent across the various federal anti-discrimination statutes)); *Downey v. Charlevoix Cnty. Bd. of Road Comm'rs*, 576 N.W.2d 712,

---

[3] Michigan's anti-disability-discrimination law "substantially mirrors the ADA, so resolving an ADA claim will generally resolve a plaintiff's [state-law-based] claim" as well.  *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 769 (6th Cir. 2025) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012)).  Michigan state law differs from the ADA in its exhaustion requirement, and unlike the ADA, Michigan state law does not "require[] accommodation in the form of reassignment," *Id.* at 770 (quoting *Rourk v. Oakwood Hosp. Corp.*, 580 N.W.2d 397, 400-01 (Mich. 1998)), but neither issue is raised in this appeal.  Both parties agree that the standards are the same.  Thus, we utilize the same analysis for the federal- and state-law disability discrimination claims.

715-17 (Mich. Ct. App. 1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20-22 (1993)) (basing Michigan's disability-based hostile-work-environment analysis on the federal Title VII framework)). Thus, it is no surprise that as courts change the hostile-work-environment analysis as it pertains to one protected class, the principles extend to other hostile-work-environment claims, including those based on disability discrimination. *See Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (per curiam) (extending Title VII hostile-work-environment caselaw to disability-based claims); *McNeal v. City of Blue Ash*, 117 F.4th 887, 897-99 (6th Cir. 2024) (citing *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 837-40 (6th Cir. 2024)) (extending new developments in the Title VII hostile-work-environment analysis to age-based discrimination claims).

After the district court decided Yunion's motion for summary judgment, this circuit decided *McNeal*, which established two significant changes to the general hostile-work-environment analysis: (1) courts can now consider discrete, separately actionable adverse employment actions as evidence contributing to a hostile work environment; and (2) plaintiffs are no longer required to show *unreasonable* interference with work performance to mount a claim. 117 F.4th at 899-900. Because these changes should extend to disability-based hostile-work-environment claims, the parties argued under a now-outdated standard in the district court.[4] Nonetheless, these changes do not alter the ultimate result: Kellar failed to provide evidence from which a jury could reasonably rule in her favor.[5]

### a. New Changes to Hostile-Work-Environment Caselaw

*Expanding the Scope of Conduct that Contributes to a Hostile Work Environment*

In *McNeal*, our court reconciled the messy precedent that distinguishes separately actionable discrete acts of workplace discrimination (often described as "adverse employment

---

[4]Neither party referenced *McNeal* in their appellate briefing, even though the opinion was published before Kellar filed her notice of appeal. This does not change our obligation to apply the binding law of the circuit.

[5]In the district court proceedings, Kellar disregarded contemporaneous caselaw and sought to use separately actionable adverse employment acts as evidence of a hostile work environment. *See Ogbonna-McGruder*, 91 F.4th at 840. She thus created a record that accommodates the updated hostile-work-environment standard.

actions") from harassment that can contribute to a hostile work environment. 117 F.4th at 899-903. The distinction was based on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), which held that discrimination claims based on "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" are "different in kind" from hostile-work-environment claims. *Id.* at 114-15. While discrete acts "constitute[] a separate actionable 'unlawful employment practice,'" a hostile-work-environment claim necessarily involves "repeated conduct" that creates a "workplace . . . permeated with 'discriminatory intimidation, ridicule, and insult, . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 114-16 (quoting *Harris*, 510 U.S. at 21).

Because a claim alleging a discrete act of discrimination was treated as "different in kind" from a claim alleging a hostile work environment, the Sixth Circuit had "consistently held that allegations of discrete acts . . . 'cannot properly be characterized as part of a continuing hostile work environment.'" *Ogbonna-McGruder*, 91 F.4th at 840 (quoting *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 783 (6th Cir. 2005)). In other words, a discrete act that causes an employee to suffer "a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some other actual and unfavorable change in job status," *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 786 (6th Cir. 2024) (explaining when a discrete act becomes separately actionable), was not considered harassment and was thus excluded from the hostile-work-environment analysis. *See Ogbonna-McGruder*, 91 F.4th at 840.

In steps *McNeal*. When asked to analyze allegations of age-based discrimination that blurred the line between discrete-act and continuing-harassment, *McNeal* recognized that our long-standing precedent only determined that "allegations of discrete discriminatory acts otherwise actionable as independent disparate-treatment claims do not *by themselves* constitute harassment supporting a hostile-work-environment claim." 117 F.4th at 899 (emphasis added). The *McNeal* panel further noted that there are some discrete acts that "affect employment terms or conditions on two registers." *Id.* at 901. A discrete act may, in and of itself, affect the terms of employment, but the discrete act's ancillary effects (or the way in which the discrete act was carried out) may constitute harassment that contributes to a hostile work environment. *Id.* at

901-02 ("[A] discrete discriminatory act may have 'occurred' on one day and thus be actionable, but it also may be part of a separate harm that 'occurs over a series of days or perhaps years.'" (quoting *Morgan*, 536 U.S. at 110)).

For example, a decrease in compensation constitutes a discrete act that causes a change in the terms or conditions of employment in a traditional sense—a loss of pay or benefits that could form the basis of a separately actionable claim for adverse-action-based disability discrimination. *Milczak*, 102 F.4th at 786. But a decrease in compensation, if "deployed strategically as harassment[,] can also add to a climate of hostility that represents a different change in the terms or conditions of the job." *See McNeal*, 117 F.4th at 901. While long-standing precedent instructs courts to determine which alleged acts of harassment should be excluded from the hostile-work-environment analysis due to their potential to serve as the basis of a separate claim, *McNeal* clarified that courts should also determine whether—and to what extent—a separately-actionable-discrete-act's "ancillary impacts" provide "evidence of harassment" that "may be used to support a hostile-work-environment claim." *Id.* at 902 & n.14. Simply put, *McNeal* determined that precedent did not categorically prohibit courts from considering a separately actionable discrete act as conduct contributing to a hostile work environment; a closer analysis of the discrete act's impact is necessary, as it might "provide[] evidence of the environment of harassment . . . allege[d] in [a] hostile-work-environment claim. *Id.* at 901-03. If it does, "we may consider that evidence." *Id.* at 903.[6]

*Lowering the Bar for a Plaintiff's Alleged Harm*

*McNeal* made an additional change to the hostile-work-environment analysis. *McNeal* came shortly after the Supreme Court decided *Muldrow*, which held that a plaintiff bringing a Title VII discrimination claim based on a "'disadvantageous' change in an employment term or condition" did not have to show that "the harm [he] incurred was 'significant[]' . . . [o]r serious,

---

[6]Some of our sister circuits go a step further, not limiting the ways in which a separately actionable adverse employment action can serve as evidence of a hostile work environment. *McNeal*, 117 F.4th at 902 n.15 (collecting cases). But we are bound by our in-circuit precedent that distinguishes the separately actionable adverse employment action from its ancillary impacts. *Id.*

or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 601 U.S. 346, 354-55 (2024).

While *Muldrow* addressed an adverse employment action (an employee transfer), *McNeal* extended this holding to hostile-work-environment claims, recognizing that hostile-work-environment claims are similarly based on a disadvantageous change to a term, condition, or privilege of employment. *McNeal*, 117 F.4th at 904 (citing *Muldrow*, 601 U.S. at 355). The anti-workplace-discrimination statutes do not require a heightened showing of harm, so courts should ask whether a work culture permeated with discriminatory harassment "left an employee 'worse off respecting employment terms or conditions,'" not whether an employee was *significantly* worse off. *Id.* (quoting *Muldrow*, 601 U.S. at 355).

The pre-*McNeal* standard, under which a plaintiff had to show *unreasonable* interference with work performance, *see Bryant*, 72 F.4th at 151-52, required a heightened showing of harm that is incongruent with the new, diminished burden on plaintiffs. *Muldrow* noted that a reasonableness standard created the kind of heightened bar for harm that is not required in a discrimination claim. 601 U.S. at 357-58 (explaining that while retaliation claims "capture those (and only those) employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination,'" discrimination claims do not "distinguish[] between significant and less significant harms" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Thus, a plaintiff no longer needs to show unreasonable interference with work performance to mount a hostile-work-environment claim; an employee need only show that the work environment "produce[d] 'some harm respecting an identifiable term or condition of employment.'" *McNeal*, 117 F.4th at 904 (quoting *Muldrow*, 601 U.S. at 355).

Importantly, *McNeal* did not discard the objective standard that stands as a core requirement to hostile-work-environment claims. *Id.* at 898 ("[T]he harassment [must have] affected the employee 'by creating an objectively intimidating, hostile, or offensive work environment.'" (quoting *Crawford*, 96 F.3d at 834-35)). Plaintiffs still must show a work environment that "would reasonably be perceived . . . as hostile or abusive." *Id.* at 904 (quoting *Harris*, 510 U.S. at 22). And, in this regard, the considerations remain the same: "we consider

the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threating or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).**[7]** This remains a high bar, as the employer's conduct must still reflect a workplace culture of harassment permeated with hostility towards the protected class. *Id.* at 897; *see also, e.g.*, *Faragher*, 524 U.S. at 787-88 ("A recurring point in these opinions is that 'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (collecting cases) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998))).

But now, after *Muldrow* and *McNeal*, courts cannot require a plaintiff to show that he suffered a heightened level of harm to succeed on a hostile-work-environment claim. For summary judgment purposes, once a plaintiff provides evidence that the environment itself was objectively hostile to the protected class, so long as the hostility "produce[d] 'some harm respecting an identifiable term or condition of employment,'" he meets his burden. *McNeal*, 117 F.4th at 904, 906 (quoting *Muldrow*, 601 U.S. at 355) (denying a police officer the discretion afforded to colleagues—based on an environment permeated with agism—constituted a disadvantageous change in an employment term or condition sufficient for a hostile-work-environment claim).

---

**[7]**In light of the declaration—consistent with *Muldrow*—that an essential question becomes whether the hostile work environment merely leaves an employee "worse off respecting employment terms or conditions," requiring only "some harm" as opposed to any heightened harm, it is worth discussing *McNeal*'s language that allows courts to consider "whether [the discriminatory conduct] *unreasonably* interferes with an employee's work performance." *McNeal*, 117 F.4th at 904 (emphasis added) (quoting *Faragher*, 524 U.S. at 788). While *requiring* a plaintiff to show unreasonable interference with his work performance would establish a heightened bar for harm that contradicts the command of *Muldrow*, the *McNeal* panel was careful to clarify that this was no mandatory consideration; unreasonable interference with employee work performance remained one consideration in a totality-of-the-circumstances analysis. *See id.* Showing unreasonable interference with work performance would bolster a hostile-work-environment claim, but the flexibility for courts to consider such interference with an employee's work performance should not be construed as a requirement that conflicts with the ultimate holding from *McNeal*: the plaintiff need not show a significantly disadvantageous change to the terms or conditions of employment. *See id.* In fact, *McNeal* excluded any mention of unreasonable interference with work performance from its articulation of the hostile-work-environment-claim elements, *id.* at 898, deviating from precedent that had required it. *See Milczak*, 102 F.4th at 783, 785 (including unreasonable interference with work performance as an element of a hostile-work-environment claim, but ultimately concluding that the alleged harassment "was neither objectively severe nor pervasive").

\*        \*        \*

Thus, to align with these developments in discrimination caselaw, for a disability-based hostile-work-environment claim, the standard is as follows: a plaintiff must show that (1) he is disabled; (2) he "was subjected to harassment, either through words or actions, based on" his disability; (3) the harassment "create[d] an objectively intimidating, hostile, or offensive work environment" that "produce[d] 'some harm respecting an identifiable term or condition of employment'"; and (4) "there is some basis of liability on the part of the employer." *See McNeal*, 117 F.4th at 898, 904, 906 (quoting *Crawford*, 96 F.3d at 834-35 and *Muldrow*, 601 U.S. at 355).

### b. Applying the Updated Standard

Kellar needed to provide evidence showing that, due to harassment based on her disability,[8] her work environment was "objectively intimidating, hostile, or offensive." *Id.* at 898 (quoting *Crawford*, 96 F.3d at 834-35). She did not. "Whether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'" *Id.* at 904 (quoting *Crawford*, 96 F.3d at 835-36). Courts answer this question looking to the totality of the circumstances. *Id.* (quoting *Faragher*, 524 U.S. at 787-88).

"Conversations between an employee and his superiors about his performance" do not create a hostile work environment "simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). Similarly, a single incident of a supervisor "express[ing] skepticism regarding [an employee's] condition" is not enough. *Trepka*, 28 F. App'x at 461. The workplace must be "permeated with discriminatory intimidation, ridicule, and insult." *McNeal*, 117 F.4th at 897 (quoting *Oncale*, 523 U.S. at 78).

Kellar claims she was subjected to a hostile work environment due to her disability because Yunion denied her mileage reimbursement request, failed to timely provide paystubs, reduced her hours and rate of pay, revoked her benefits and paid holidays, and sent her a text insinuating she would be fired. Beyond conclusory statements, Kellar does not explain how,

---

[8]The parties did not discuss whether Kellar should be considered disabled under the relevant statutes, so we will not address it.

from this alleged harassment, her work environment "would reasonably be perceived . . . as hostile or abusive." *McNeal*, 117 F.4th at 904 (quotation marks omitted). Nor does she provide evidence from which a reasonable jury could infer such an environment existed at Yunion.

*Denying Kellar's Mileage Request.* Yunion denied Kellar's mileage reimbursement request in accordance with company policy; Kellar presented no evidence indicating the denial was improper or the product of selective enforcement. Nor does she show how the denial—or its ancillary effects—perpetuated an environment of hostile, discriminatory harassment.

*Failing to Provide Paystubs.* Yunion violated Michigan law by failing to provide paystubs for all of its employees. Kellar complained to the Michigan Department of Labor about this shortcoming. When the Michigan Department of Labor notified Yunion about the complaint, Yunion corrected its policies and ensured paystubs were available for all employees. Kellar does nothing to suggest Yunion specifically withheld her paystubs as a strategic form of harassment, let alone harassment based on her claimed disability.

*Reducing Kellar's Hours and Rate of Pay; Revoking Kellar's Holidays.* Yunion only ever adjusted Kellar's hours as part of her temporary health-concern accommodation, and during that period, she maintained full benefits. Granting her request for remote work is not harassment, and Kellar fails to explain how the email seeking confirmation of her medical condition, which expressed a desire to appease her concerns, helps prove an environment permeated with hostility. Yunion *proposed* reducing her pay and benefits as part of its plan to shift her to an independent contractor role, but Kellar rejected the offer. Kellar does not provide evidence from which a jury could reasonably conclude that the ancillary effects of the decision to offer her an independent contractor role, or the way in which Yunion presented this option, contributed to a hostile environment. *See McNeal*, 117 F.4th at 902 & n.14.

*Text Message.* Kellar testified that the allegedly harassing text message from Wilson, which insinuated that Kellar would be fired, merely made her nervous about losing her job; it did not display disability-based hostility or contribute to a workplace permeated by harassment. Kellar does not provide evidence that calls into question Wilson's frustration with what was perceived as Kellar's unexcused absences, and she presents no evidence indicating the text

message was strategically deployed as harassment, or that the ancillary effects of the text message contributed to a hostile work environment. Without any additional evidence or explanation, Kellar's conclusory declaration that the "shrug" emoji indicates disability-based hostility is too large a leap. The conduct Kellar cites, even when considered cumulatively, is insufficient to survive summary judgment on a hostile-work-environment claim.

Kellar suggests—for the first time in her reply brief—that other indicia of a hostile work environment exist. She asserts that her work environment was hostile because she was allegedly "excluded from meetings, mocked for her condition, told she was the problem, denied access to staff celebrations, and ultimately isolated and pushed out," supposedly experiencing "a consistent pattern of disrespect and marginalization following her accommodation request." Appellant's Reply Br. 5-6, D.27. She does not provide any citations to the record to support these allegations.

Kellar's sworn declaration makes no reference to harassing conduct. Her attorneys deposed Yunion supervisors and uncovered no harassing conduct. And when Kellar testified at her own deposition, she only mentioned two types of conduct that could conceivably constitute harassment: (1) Yunion allegedly excluded her from events and meetings; and (2) Yunion allegedly questioned or minimized her claimed disability and publicly "broadcast[ed]" her health concerns to staff.[9]

But the record indicates that, even with these additional *allegations* of purported harassment, Kellar still did not provide sufficient *evidence* to show an objectively hostile environment. While Kellar did not attend some onsite company events and meetings, her "exclusion" was not attributable to Yunion; she refused to enter the building. *See, e.g.*, Email from LaNetra Kellar, Yunion Case Manager, to Nicole Wilson, Exec. Dir. of Yunion (Oct. 21,

---

[9]Kellar introduces evidence to suggest that Yunion's treatment of Raynetta Bradley—another employee who claimed to have experienced health complications from the post-flood work conditions—supports her hostile-work-environment claim. "In a hostile-work-environment claim, a plaintiff may introduce evidence of 'discriminatory acts or practices [directed] at the protected group of which the plaintiff is a member, and not just at the plaintiff.'" *McNeal*, 117 F.4th at 898 (alteration in original) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999)). But the evidence, which alleges Yunion took extreme measures to confirm Bradley's alleged medical condition and eventually terminated Bradley for supposedly falsifying work hours—does not provide sufficient support for Kellar's hostile-work-environment claim. *See* Bradley Decl., R.20-6 at PageID 803-06.

2019 at 03:33 PM), R.15-7 at PageID 468; Kellar Dep., R.15-2 at PageID 145. Further, Kellar presents no evidence that Yunion minimized or "mocked" her condition, or that she was "told she was the problem." *See* Kellar Reply Br. 5-6, R.27. Nor is there evidence that Yunion publicly broadcasted her health concerns to other staff in a harassing way. Kellar needs more than broad, conclusory statements alleging harassment. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009))). She has failed to provide supporting evidence for these assertions of alleged hostility.

Aside from Kellar's conclusory allegations, the record indicates that Yunion took Kellar's complaints seriously and tried to make her feel comfortable with regard to office safety. *See* Email from Nicole Wilson, Exec. Dir. of Yunion, to LaNetra Kellar, Yunion Case Manager (Oct. 22, 2019 at 11:48 AM), R.15-7 at PageID 472 ("We are making these temporary accommodations out of consideration for the concerns you have about your health and well being. . . . We truly appreciate the work that you do as a Case Manager for the Yunion. You are excellent at your job. We hope we can continue our work together as a ministry and as a family and put all of this behind us.").

True, after Kellar relayed her health concerns to Yunion and provided the initial doctor's note, Wilson asked for more sufficient medical proof explicitly stating that Kellar could not work in Yunion's building. *See* Email from Nicole Wilson, Exec. Dir. of Yunion, to LaNetra Kellar, Yunion Case Manager (Oct. 14, 2019 at 07:53), R.15-7 at PageID 455. But Yunion had the right to ask for documentation from a health care provider articulating the medical necessity of her accommodation. *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020) (explaining that an employee "must" provide proof that an accommodation is medically necessary "when asked by his employer"). And Kellar's second doctor's note did not suffice. *Compare* Oct. 15, 2019 Doctor's Note, R.15-7 at PageID 461 ("I would recommend [Kellar] works off site."), *with Kennedy v. Superior Printing Co.*, 215 F.3d 650, 652, 656 (6th Cir. 2000) (holding that a doctor's note that stated a medical problem and merely proposed a solution did

not articulate medical necessity).   Nonetheless, Yunion still granted Kellar's request without an obligation to do so, allowing her to work remotely in an effort to relieve her concerns.

Kellar also did not provide any evidence—beyond conclusory statements—indicating the work environment at Yunion "produce[d] 'some harm respecting an identifiable term or condition of employment.'" *McNeal*, 117 F.4th at 904 (quoting *Muldrow*, 601 U.S. at 355).  She provides no evidence showing that, due to harassment, she faced any limitations—or other harm—with respect to performing the case manager responsibilities or her general standing in the office.  While "some harm" is a lower bar than unreasonable interference, she still does not meet it.  In all, applying the updated hostile-work-environment standard does not change the result; Kellar does not provide evidence from which a jury could reasonably determine that an objectively hostile environment produced some harm with respect to the terms or conditions of her employment.  *See Est. of Hill v. Miracle*, 853 F.3d 306, 317 (6th Cir. 2017) (holding that remand to apply a different legal standard is "unnecessary if 'the record permits only one resolution of the factual issue'" (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982))).

## 2.  Adverse-Employment-Action and Failure-to-Accommodate Claims

Kellar claims she was subjected to adverse employment actions at Yunion due to her disability.  She also claims Yunion failed to accommodate her disability.  Even though these are distinct discrimination claims, because they share a common element that proved dispositive, the district court analyzed them together.  So do we.

For Kellar to succeed on either her adverse-employment-action claims or her failure-to-accommodate claims, she must demonstrate that she was otherwise qualified for the case manager position despite her disability.  *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391-95 (6th Cir. 2017) (analyzing both an adverse-employment-action claim and a failure-to-accommodate claim).  To do so, Kellar would need to show that she could perform the essential functions of the job with a reasonable accommodation.  *Id.*

According to our circuit's precedent, satisfying this element is itself a three-part inquiry.  First, "the employee typically bears 'the initial burden of proposing an accommodation and showing that [the] accommodation is objectively reasonable.'"  *Cooper v. Dolgencorp, LLC*, 93

F.4th 360, 371 (6th Cir. 2024) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)). If the employee satisfies this first step, he must then demonstrate that with this proposed accommodation, he could perform the essential functions of the job. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010); *see also* 29 C.F.R. § 1630.2(o). If the employee makes such a showing, then the employer would need to provide the reasonable accommodation "unless [the employer] can demonstrate that the accommodation would impose an undue hardship" on its operations. 42 U.S.C. § 12112(b)(5)(A); *see also King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 568 (6th Cir. 2022) ("[A] defendant can still be granted summary judgment[] if there are no genuine issues of material fact controverting the conclusion that the reasonable accommodation would impose an undue hardship on the employer." (quoting *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003))).

### a. Proposing a Reasonable Accommodation

An accommodation allows an individual to perform a job despite any limitations imposed by the disability. *See Jakubowski*, 627 F.3d at 202 (evaluating whether a physician's proposed accommodation actually improved his ability to treat patients). That accommodation is reasonable if it "mak[es] existing facilities used by employees readily accessible to and usable by individuals with disabilities," or if it represents an "appropriate adjustment or modification[] of . . . policies" that already exist. 42 U.S.C. § 12111(9). Both "job restructuring" and "part-time or modified work schedules" constitute reasonable accommodations. *Id.*

As her proposed accommodation, Kellar requested the opportunity to work from home for an extended period of time. Kellar provided evidence showing Yunion allowed employees to periodically work from home for short periods of time. Allowing Kellar to continue working offsite would merely "mak[e] existing facilities used by employees readily accessible to and usable by individuals with disabilities," reflecting an "appropriate adjustment or modification[]" to Yunion's policies that permitted remote work. *See id.* Thus, even if it would only allow for Kellar to work on a part-time basis, in this context, an extended period of remote work amounts to a reasonable accommodation.

**b. Performing the Essential Functions of the Job**

The question becomes: could Kellar perform the essential functions of the job while working from home for an extended period of time?  As made clear by the record, the answer is no.

"Whether a job function is essential is a question of fact that is *typically* not suitable for resolution on a motion for summary judgment."  *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 525 (6th Cir. 2021) (emphasis added) (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014)).  In attempting the analysis, courts consider "[t]he employer's judgment," "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job," "[t]he amount of time spent on the job performing the function," and "[t]he consequences of not requiring the incumbent to perform the function."  29 C.F.R. § 1630.2(n)(3).  Ultimately, a "job function may be considered essential because (1) the position exists to perform the function, (2) a limited number of employees are available that can perform it, or (3) it is highly specialized."  *Rorrer*, 743 F.3d at 1039 (citing 29 C.F.R. § 1630.2(n)(2)).

Kellar argues that while working from home, she would be able to complete all essential functions of her job.  But she does not provide evidence to support this assertion.  On the contrary, the record—including Kellar's sworn testimony—shows that case managers had to be onsite to perform essential functions of the job.

For Yunion to comply with the parameters of Wayne County's funding contract, Yunion was required to keep hard copies of each case file.  These files would remain locked in a file cabinet onsite, and Wayne County could audit the files "without prior notice."  Because Yunion's funding was conditioned on satisfactory Wayne County audits, onsite case file management—which ensured the records were complete and accurate—was a crucial part of the job.  Reed Dep., R.15-4 at PageID 283.  In Kellar's own words, "maintaining the [case] file is important."  Kellar Dep., R.15-2 at PageID 143.  And she recognized that in order to manage the hard copy files, she would have to be onsite with the locked file cabinets—she knew that if she worked offsite for an extended period of time, someone else would have to handle her onsite work.  *Id.* at PageID 149; Email Exchange Between LaNetra Kellar, Eric Reed, and Nicole

Wilson, R.15-7 at PageID 464. Yunion's case manager job description provides additional support for this notion, listing file management and document review as some of the principal responsibilities for the position.

Kellar's onsite file management responsibilities were even more essential at the time of her request. Yunion was preparing for an upcoming audit, so case managers were expected to "fine-tooth-comb their files." Wilson Dep., R.15-3 at PageID 202. In the weeks leading up to an audit, case managers spent around half of their time managing the onsite files. Further, although the case manager position did not exist solely to perform the onsite case file management, Yunion relied on its case managers to complete this critical task. Even through COVID, Yunion created a staggered schedule that allowed case managers to go onsite for case file management. And with limitations on case manager caseload, and preestablished responsibilities for interns, there were only so many other employees who could take on Kellar's onsite file management.

Kellar offers no evidence showing the onsite file management was anything but essential. Instead, she offers an orthogonal argument: because she created the records offsite, Yunion did not require all forms of the case files to remain in the locked cabinet. But the existence of other forms of the case files does not negate the necessity of maintaining complete and accurate versions of the onsite, hard copy files subject to Wayne County audits.

Kellar also argues that interns could have handled her case management responsibilities. But the duty to provide a reasonable accommodation "does not require employers 'to create new jobs [or] displace existing employees from their positions . . . to accommodate a disabled individual.'" *Cooper*, 93 F.4th at 372 (alterations in original) (quoting *Kleiber*, 485 F.3d at 869). "Nor does a reasonable accommodation require employers to eliminate or reallocate an essential job function." *Id.* Kellar's request for Yunion to reallocate this essential function of her job to others was not reasonable.

By all accounts, managing hard copies of case files was an essential function of the case manager role, and it had to be done onsite. Thus, Kellar could not perform the essential functions of her job even with her proposed accommodation (working from home).

Accordingly, she fails to satisfy this essential element of her adverse-employment-action and failure-to-accommodate claims.

## B. Retaliation Claims

Kellar argues that, because she requested a disability accommodation and filed complaints with state agencies, Yunion retaliated against her by reducing her hours and pay, revoking her benefits, denying her mileage reimbursement request, and ultimately firing her. She thus brings two different kinds of retaliation claims. Her claims alleging retaliation for requesting an accommodation and filing a disability-based discrimination complaint arise under the federal and state disability statutes. *See Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 760, 767 (6th Cir. 2025). Her claims alleging retaliation for filing workplace complaints (related to building safety, mileage reimbursement, and paystubs) with state agencies arise under Michigan's Whistleblower Protection Act. *See Kuhn v. Washtenaw County*, 709 F.3d 612, 629 (6th Cir. 2013).[10]

Each claim proceeds with a nearly identical analysis that follows the familiar *McDonnell Douglas* burden-shifting framework. *Pemberton*, 150 F.4th at 767, 769-70; *Kuhn*, 709 F.3d at 629. Kellar must first establish a prima facie case for her respective retaliation claims; if she does, the burden shifts, and Yunion must provide a "legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Yunion provides such a reason, the burden shifts back to Kellar to show that the proffered reason was pretextual. *Id.* at 804.

### 1. Establishing a Prima Facie Case

### a. Disability-Based Retaliation

For Kellar to establish a prima facie case under the ADA and Michigan's anti-disability discrimination statute, she must show that "(1) [s]he engaged in activity protected under the ADA"; (2) Yunion "knew of that activity"; (3) Yunion "took an adverse action against [her]; and

---

[10]Kellar blends her retaliation claims together, but she argues they fall under the anti-disability statutes and Michigan's Whistleblower Protection Act.

(4) there was a causal connection between the protected activity and the adverse action." *Pemberton*, 150 F.4th at 767, 769 (quoting *Rorrer*, 743 F.3d at 1046). Under the anti-disability-discrimination statutes, Kellar's only protected activities would be her request for an accommodation and the disability-related complaint she filed with the Michigan Department of Civil Rights. *See id.* at 760, 767. Kellar does not provide any evidence indicating her other complaints—related to workplace safety, denial of mileage reimbursement, and failure to provide pay stubs—had any connection to her disability or other activity protected under these anti-disability-discrimination statutes.

*Request for Disability-Based Accommodation.* Kellar argues that Yunion reduced her pay, hours, and benefits due to her accommodation request. While Yunion did shift her to part-time work when she could not perform the onsite functions of her job, which reduced her hours (but did not revoke her benefits), this alleged adverse action was the reasonable accommodation she sought. For retaliation claims, an adverse action is conduct that could "dissuade a reasonable person from engaging in the protected activity." *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) (citing *White*, 548 U.S. at 68). Granting Kellar's requested accommodation, by shifting her to part-time work, is not an adverse action in this context; it is employer activity the ADA explicitly endorses to accommodate an individual. 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o). Certainly, the act of granting an employee's request would not dissuade a reasonable person from seeking a similar—or even a different—accommodation request.

And to the extent Kellar tries to pin her purported termination on her accommodation request, she again falls short of establishing a prima facie case. She requested the accommodation to work from home in September and October of 2019. She argues temporal proximity and the text message from Wilson establish causation. Not so. Kellar continued to work as a Yunion case manager for a year after her accommodation request, which constitutes enough time to defeat her temporal proximity argument. *Pemberton*, 150 F.4th at 768; *see also Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) ("[A] roughly 75-day delay between [plaintiff's] protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."). Similarly, Wilson's intemperate text message—which was sent a year prior to Kellar's purported termination—does not allow for a reasonable

inference that Kellar was terminated due to her accommodation request. The communication between Wilson and Kellar after the text, and Yunion's conduct (accommodating her request and continuing an employment relationship for an additional year thereafter) undermine this sole piece of circumstantial evidence, particularly when it stands alone. "'The mere existence of a scintilla of evidence in support of the plaintiff's position' is not enough" to survive summary judgment. *United States ex rel. O'Laughlin v. Radiation Therapy Servs., P.S.C.*, 148 F.4th 791, 802 (6th Cir. 2025) (quoting *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019)). The text message is a mere single beam too feeble to serve as the foundation of her causation argument.

*Disability-Related Complaint.* Kellar's disability-related complaint, filed with the Michigan Department of Civil Rights, fares no better. Yunion became aware of this complaint on December 17, 2019. The almost year-long gap between protected activity and alleged adverse action extinguishes the temporal proximity argument, and because Yunion became aware of Kellar's civil rights complaint after Wilson had sent the text message, the text message's value as circumstantial evidence is even further diminished. Wilson sent that text message without any knowledge of Kellar's complaint. Kellar fails to provide evidence from which a reasonable jury could infer retaliation based on activity protected by the anti-disability discrimination statutes.

### b. Whistleblower-Based Retaliation

For Kellar to establish a prima facie case under the Whistleblower Protection Act, Kellar must show that (1) she engaged in protected activity as defined by the statute; (2) she suffered an adverse employment action; and (3) there exists a causal connection between the protected activity and the adverse action. *See Kuhn*, 709 F.3d at 628-29. She claims her various work-related complaints to the Michigan Occupational Safety and Health Administration and the Michigan Department of Labor constitute protected activity.

Kellar, again, fails to establish a prima facie case because she does not provide evidence of causation. Instead, Kellar declares that temporal proximity suffices. However, Michigan courts make clear that temporal proximity alone does not establish causation for a retaliation

claim under the Whistleblower Protection Act. *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 472-73 (Mich. 2003) (citing *Taylor v. Mod. Eng'g, Inc.*, 653 N.W.2d 625, 630 (Mich. Ct. App. 2002) (analyzing a Whistleblower Protection Act claim)); *see also Kuhn*, 709 F.3d at 629-30. Kellar offers no other evidence of causation. Thus, she has not established a prima facie case.

## 2. Pretext

Even if Kellar could establish a prima facie case for her retaliation claims, Yunion's legitimate, nondiscriminatory explanations for its conduct are not pretextual. Yunion asserts that it reduced Kellar's hours during her employment tenure due to her accommodation request, and it presented Kellar with the option to accept an independent contractor position (which would have reduced her pay and hours, revoked her benefits, taken away her holidays, and ultimately led to her employment relationship ending) due to budget constraints. Kellar does not argue that Yunion's decision to reduce her hours as a disability accommodation was pretextual. Instead, Kellar only argues that Yunion's asserted budgetary rationale was pretextual. Whether it was due to her activity protected under the anti-disability-discrimination statutes or the Whistleblower Protection Act, Kellar insists the decision to offer her the independent contractor position was retaliatory.

"Our caselaw does not prescribe any particular method for showing pretext." *Gray v. State Farm Mut. Auto. Ins. Co.*, 145 F.4th 630, 640 (6th Cir. 2025). "Usually, plaintiffs show pretext by arguing that the employer's proffered reason lacked a factual basis, did not actually motivate the adverse action, or was insufficient to motivate the adverse action." *Id.* Here, Kellar is unable to show pretext by any of these methods.

Yunion's proffered budgetary reason for offering Kellar an independent contractor role is supported by facts in the record. Due to COVID, and the limited opportunities to provide reimbursable services, Yunion lost over half of its budget for the diversion department. Despite serving one-third of her typical client load, Kellar was earning a full salary with benefits. By shifting Kellar to an independent contractor role, Yunion could adjust its workforce to match the decreased demand for its services, save money on payroll, and maintain an employment relationship with a successful employee. Kellar was the only full-time case manager in a

financially struggling department; Yunion asserts this was a "necessary fiscal decision for the organization." Wilson Dep., R.15-3 at PageID 182-83. The record provides ample support for Yunion's proffered motivation.

And Kellar does not present evidence that challenges the factual basis of Yunion's legitimate, nondiscriminatory reason for her purported termination. Nor does she present evidence indicating Yunion actually had an ulterior motive, or that the budgetary constraints were insufficient to explain Yunion's conduct. Kellar notes that Yunion received a Paycheck Protection Plan loan for $129,600. This loan allowed Yunion to maintain its payroll (including Kellar's full-time position) for the covered period, as intended. The loan did not sufficiently make up for the significant budgetary shortfall in the diversion department, and the loan was intended to support Yunion's entire staff.

Kellar also points to the fact that Yunion hired one full-time case manager in May 2020 and other case managers after Kellar's departure, insinuating that these staff additions undermine Yunion's alleged budgetary issues. But at the time Kellar left Yunion, the full-time case manager hired in 2020 provided services exclusively in Yunion's workforce development department, which was funded through a different contract, and thus financially independent from Kellar's diversion department. Further, the case managers hired after Kellar left Yunion were independent contractors. Yunion maintains that it had funding for an independent contractor role—indeed, it offered that position to Kellar first. Yunion hiring different independent contractors does not call into question the organization's inability to support a full-time case manager and the associated benefits.

Finally, Kellar raises temporal proximity, arguing that the timing of Yunion's offer to shift her to an independent contract role indicates pretext. Because Kellar's other arguments related to pretext are insufficient, temporal proximity is her only remaining evidence of pretext. But "temporal proximity cannot be the sole basis for finding pretext." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). Thus, Kellar has failed to provide evidence that would allow a jury to reasonably reject Yunion's legitimate, nondiscriminatory motivations.

## C. Wrongful-Termination Claim

Kellar also argues that Michigan's public policy principles prohibit Yunion's conduct. She claims she was fired for her refusal to work in a building that was unsafe. Michigan is an "at-will" termination state, so employers can fire an employee "for any reason or no reason at all" unless the termination violates public policy. *Jackson v. Genesee Cnty. Road Comm'n*, 999 F.3d 333, 353 (6th Cir. 2021). An at-will termination violates public policy if

> (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment.

*Id.* (quoting *McNeil v. Charlevoix Cnty.*, 772 N.W.2d 18, 24 (Mich. 2009)).

Kellar runs into a number of issues with this claim. First, as the district court correctly noted, Kellar abandoned this claim by failing to defend it in response to Yunion's motion for summary judgment, so we "need not consider [it]." *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007).

Second, to the extent Kellar attempts to revive this claim, she failed. Kellar's 90-word, citationless paragraph in her opening brief that merely alludes to the wrongful termination doctrine falls woefully short of her obligation to develop an argument upon which she seeks relief. *See Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 896 (6th Cir. 2025) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (cleaned up) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997))). And Kellar's reply brief only discusses general concepts of public policy doctrines. In all, Kellar points to no law or facts that warrant granting her relief under Michigan's wrongful termination doctrine, a fatal shortcoming.[11] She mentions this issue only in "a perfunctory

---

[11]Notably, Kellar does not provide evidence showing Yunion actually terminated her. Kellar's employment relationship with Yunion ended when she refused to accept a different position within the organization. And Kellar has not presented evidence that shows she was subjected to a constructive discharge. *See Joliet v. Pitoniak*, 715 N.W.2d 60, 67 (Mich. 2006) (explaining that constructive discharge "occurs when a reasonable person in the employee's place would feel compelled to resign").

manner, unaccompanied by some effort at developed argumentation," so we "deem[] [her argument] waived." *Id.* at 896 (quoting *McPherson*, 125 F.3d at 995-96).

## IV.  CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment.